**Hector CRUZ et al., Plaintiffs,**

v.

**Benjamin WARD, Individually and in his capacity as Commissioner of the New York State Department of Correctional Services, et al., Defendants.**

**No. 75 Civ. 5334 (GLG).**

United States District Court,
S. D. New York.

Dec. 17, 1976.

Mid Hudson Valley Legal Services Project, Poughkeepsie, N. Y., for plaintiffs; by Jane E. Bloom, Poughkeepsie, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendants New York State Department of Law; by Arlene Silverman, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

On October 28, 1975, plaintiffs Cruz, Gulley and Perrelli, inmates in the New York State prison system, commenced an action under the provisions of 42 U.S.C. § 1983 to enjoin defendant officials of the New York State Department of Corrections and Matteawan State Hospital from transferring them from Matteawan to the general prison system without a hearing prior to transferral. Plaintiffs allege, *inter alia*, that these transfers were punishments imposed on them because of their having caused trouble in the hospital. On November 11, 1975, an order to show cause was issued on plain-

tiff's motion for a preliminary injunction. On December 15, 1975, plaintiffs Dunleavy, Poveromo, Pechar and Mitchell intervened as party plaintiffs.

Hearings at Matteawan on December 30, 1975, January 27, and March 8, 1976 and in New York City on March 10, 1976[1] established the following facts. Plaintiff, Hector Cruz, while serving a life sentence at Attica Correctional Facility, was placed in segregation in 1973. After an attempted suicide in December, 1973, he was transferred to the Diagnostic and Evaluation Center at Fishkill Correctional Facility. On January 4, 1974, Cruz was admitted to Matteawan under the provisions of Article 16 of the New York Correction Law with a diagnosis of "Schizophrenia, residual type". Cruz's treatment at Matteawan included prescriptive medication, twice weekly consultations with a psychologist, and monthly psychiatric evaluations. Cruz was placed in an open ward custody setting. In May, 1974, Cruz apparently became actively hostile toward others in the hospital. As his treatment records note, he agreed with correctional officers that "the next time he [was] involved in any physical violence he will ask for a transfer". On August 27, 1974, Cruz was, at his own request, transferred to Clinton Correctional Facility. After only two weeks in confinement (without treatment or medication) he was again sent to the Diagnostic and Evaluation unit at Matteawan. Five weeks later Cruz was admitted to the hospital again, with a diagnosis of schizophrenia with aggressive features. From October 30, 1974, through September 17, 1975, Cruz's pattern of treatment resumed, again interspersed with several reports of altercations with members of the hospital community. An evaluation by a staff psychiatrist on September 17, 1975 noted:

> ". . . the patient needs further hospitalization because he has poor self-control, immature and appeared to be unpredictable in his behavior."

On October 17, 1975, Cruz was involved in a fight in his ward (which apparently also involved some of the other plaintiffs). Three days later he was evaluated by a panel of six psychiatrists. This evaluation was not a usual hospital routine and its use in this case was not explained. Based upon this evaluation, Cruz was determined to have "recovered" from his mental illness and was ordered transferred out of Matteawan although his final diagnosis was schizophrenia, residual type.

Plaintiff, Matthew Gulley, was confined at Attica beginning in 1968 under a sentence of ten years. While in segregation at Attica, Gulley became depressed, was beset by hallucinations and made several attempts at suicide. On December 1, 1973, he was transferred to the Matteawan Diagnostic and Evaluation unit. On January 28, 1974, he was admitted to Matteawan with a diagnosis of unspecified psychosis and borderline mental retardation. An early psychiatric evaluation noted a tendency toward "episodic outbursts of aggressive behavior". Gulley's status and treatment at Matteawan included medication, psychological counselling, monthly psychiatric evaluations and open ward confinement. Throughout his confinement at Matteawan Gulley was felt by authorities to be a discipline problem. In January, 1975, he was involved in a fight in his ward and the next psychiatric evaluation note, entered on February 11, 1975, indicated the physician's conclusion that a return to prison might be necessary if the violence persisted. On the same day Gulley was transferred to the jail ward and was placed in a restraining sheet. On February 13th and 14th, he was evaluated by defendant, Lawrence Sweeney, the Chief of Psychiatry at Matteawan. Dr. Sweeney attributed the plaintiff's actions to alcohol and diagnosed Gulley as having a divided character with depressive features. After the interview Gulley was sent, without notice, to Clinton Correctional Facility where he was confined from February 25 to March 11, 1975. This confinement was marked by

---

1. These hearings were held before the writer when a U. S. Magistrate. The case was reassigned for all purposes after appointment to the District Court.

an almost complete absence of professional assistance and the total absence of medication.

After only two weeks at Clinton, prison authorities ordered Gulley returned directly to the hospital population at Matteawan. Once there, Gulley's treatment resumed on substantially the same terms as before his transfer. In July, 1975, a retention order under the provisions of Section 408 of the New York Correction Law was obtained for Gulley by the defendants. In the October 9, 1975 periodic evaluation, a staff psychiatrist made a recommendation for further retention of Gulley due to his fear of prison and unpredictable behavior, notwithstanding the psychiatrist's acknowledgment of the absence of any psychosis. On October 17, 1975, Gulley was involved in a fight in the ward and was once again placed in a restraining sheet in the jail ward. Three days later Gulley was found to be well and was sent to the Transfer unit for prison reassignment.

On April 25, 1974, George Dunleavy, having been in confinement at Greenhaven Correctional Facility, was determined to be a mentally ill person in need of treatment and was sent to the Diagnostic and Evaluation unit at Matteawan. On June 11, 1974, Dunleavy was diagnosed as a chronic schizophrenic with an anti-social personality and episodic drunkenness. The course of treatment Dunleavy received while hospitalized was substantially similar to that received by Cruz and Gulley. On December 19, 1974, a twelve-month retention order under the provisions of Correction Law § 408 was obtained by the defendants on Dunleavy. Dr. Ali Sirman, a Matteawan staff psychiatrist, acknowledged that neither during the period of the § 408 retention nor subsequently was Dunleavy, in his opinion, ever mentally ill. Dr. Sirman further testified that Dunleavy was merely neurotic and had difficulties in prison but was retained at Matteawan because he was helpful to the staff and had a rapport with the other prisoners. On March 16, 1975, Dunleavy was accused of attempting to escape from the hospital. In a periodic evaluation on April 23, 1975, Dunleavy was diagnosed as a chronic undifferentiated schizophrenic without psychosis and, shortly thereafter, was transferred back to prison. After four weeks in Greenhaven, Dunleavy attempted suicide by slashing his wrists, was transferred to the hospital, and then to Matteawan, diagnosed as an episodic schizophrenic with a personality disorder leading to anti-social behavior. The staff psychologist at Matteawan testified that Dunleavy's condition before and after this transfer was substantially unchanged. In November, 1975, a § 408 retention application was made on Dunleavy and, although staff psychiatrists indicate he is not psychotic, he remains at Matteawan.

Louis Poveromo was incarcerated at Greenhaven when, in September, 1974, he was determined to be a mentally ill person in need of treatment and was transferred to Matteawan. He was diagnosed as psychotic and drug dependent. His treatment was similar to that received by the other plaintiffs. In mid-January a § 408 retention order was requested by the hospital and granted by the court. Late in January, 1975, however, Poveromo was involved in a fight with correctional officers and was immediately thereafter evaluated by a staff psychiatrist who diagnosed Poveromo as a "troublemaker" for whom Matteawan had "no more to offer". The doctor "prescribed" transfer to a correctional institution. After this evaluation Poveromo was immediately pronounced cured and sent to Clinton prison. There Poveromo was continuously kept in a stripped cell under observation. After one month of such observation Poveromo was returned to Matteawan diagnosed as being anti-social and having a personality disorder.

George Mitchell, while confined in a segregation cell at Attica, began to hear voices and see visions in June, 1974. Three months later he was transferred under § 408 to Matteawan where he was diagnosed as having an unspecified psychosis and a personality defect. After a month at Matteawan, at his own request Mitchell was returned to prison. After several weeks at

Clinton Mitchell was again sent to Matteawan where, for six months, his treatment paralleled that of the other plaintiffs. In July, 1975, Mitchell was voluntarily transferred to the jail ward at Matteawan because of his fear of doing violence to himself or others. On October 10, 1975, Mitchell was evaluated by a staff psychiatrist who diagnosed him as recovered but bearing a "residual" amount of schizophrenia. Mitchell was not told of the psychiatrist's conclusions or of his recommendation that Mitchell be returned to prison. When later told of the decision by a correctional officer who was involved in his transfer, Mitchell, in the words of a staff psychiatrist, "went berserk" and was taken to the transfer unit in a strait jacket. While at the transfer unit Mitchell attempted suicide several times but was nevertheless transferred to Clinton prison. After two weeks at Clinton prison authorities again returned Mitchell to Matteawan, under the provisions of § 408, where he now remains.

Martin Ogulnick, a staff psychologist at Matteawan, testified that there were no set times for patient evaluations by the hospital psychiatrists, that the evaluations would occur at intervals of from two to three weeks to four months and would last from two to twenty minutes. Mr. Ogulnick testified that he had been working with both Dunleavy and Mitchell and that, in his opinion, neither should have been returned to prison. He acknowledged that different members of the Matteawan staff had different criteria for treatment and retention decisions. Mr. Ogulnick opined that neuroses were treatable at Matteawan.

Dr. Sweeney, Chief of Psychiatric Services at Matteawan, testified at length on the relative differences in the custodial conditions between the correctional facilities and Matteawan and concluded that a major attraction of the hospital was that it represented an easier "bit" for the inmate than prison. Dr. Sweeney acknowledged that before an inmate can be committed to Matteawan he must be examined by two disinterested physicians and their report must be approved by a state judge. Dr. Sweeney stated that these evaluations included reviews of the prison and medical files of the inmate, as well as personal evaluations by the physicians. Dr. Sweeney acknowledged that his staff's diagnoses do not always agree with such outside physicians' conclusions, but opined that these discrepancies were due to the outside professionals' lack of personal familiarity with the patients. Dr. Sweeney inferred that his staff was better able to detect malingering and shamming than outside professionals. He testified that evaluations were conducted on a regular four-to-six week schedule. Dr. Sweeney stated that a patient would not be retained if he did not have a treatable psychosis, yet acknowledged that patients with neurotic disorders were retained if the hospital budget permitted. He had set up a separate ward for the aggressive "acting out" patients so that, in Dr. Sweeney's words, they were "putting all the dynamite in one box". Dr. Sweeney acknowledged that four of the seven psychiatrists on his staff were not licensed for private practice in New York and that neither he nor any of his psychiatrists were board certified in psychiatry. He denied that any of the plaintiffs' transfers were related to their altercations with correctional personnel, although acknowledging that such incidents could lead to reevaluations of status.

Dr. Ali Sirman testified that he was the psychiatrist in charge of the unit responsible for certifying patients back to prison. He described the standard he applied to be whether the patient has "a contact with reality, is he competent, does he know what he is 'doing". Dr. Sirman acknowledged that there are neither written nor oral standards for his decisions as to retention or transfer and that he would retain a neurotic who was having difficulty functioning if the hospital condition permitted it. Dr. Sirman described the conditions of the several plaintiffs as either anti-social personalities or personality disorders with manipulative characteristics. He denied that any pressure from the guards induced his transfer decisions or that any of the disorders of the plaintiffs were treatable at Matteawan.

Dr. Sirman testified that the examination schedule was totally random and that a psychiatrist may not see a given patient for a year or more after an evaluation. Dr. Sirman explained the presence of Dunleavy as one who assisted the administration and was retained despite an absence of illness. He stated that once such a patient ceases to be an aid to the hospital staff the reason for his retention disappears and he should be returned to prison. Dr. Sirman further acknowledged that other non-psychotics were retained at Matteawan.

Dr. Factora testified that he was on the staff at Matteawan and performed the October 9, 1975 evaluation of Gulley and recommended retention. Dr. Factora denied that Dr. Sweeney ever questioned his retention recommendations. (Dr. Sweeney testified that he *had* so questioned Dr. Factora's recommendations.) Dr. Factora testified that, contrary to the opinions expressed by other psychiatrists, personality disorders were treatable at Matteawan. He admitted that he had diagnosed Gulley as being in need of treatment on October 9, 1975, but well enough to be transferred on October 20, 1975. Dr. Factora stated that his change of mind was due to the occurrence of a group psychiatric evaluation on the later date wherein Gulley was properly diagnosed as recovered, but that as of November, 1975, he would agree that Mitchell was again in need of hospitalization. Dr. Factora acknowledged that he had, on earlier occasions, acceded to Gulley's fear of prison and recommended retention. He described Gulley's claim that he was hearing voices and his suicide attempts as manipulative actions designed to insure retention at Matteawan. This witness also stated that Mitchell may have been on therapeutic drugs when the transfer decision was made and that he had no way of knowing whether the termination of medication would induce a relapse.

Dr. Atilla Cakir testified that he had been a staff psychiatrist at Matteawan for more than nine years and was licensed to practice medicine and psychiatry in Turkey (but not in New York).[2] Dr. Cakir was well aware of Cruz's record at Matteawan and concurred in the decision to return him to prison. Dr. Cakir described the process of evaluating a patient for transfer as a deep personal and delicate judgment. He felt that it depended on whether or not the patient was psychotic. Dr. Cakir did not believe that personality disorders could be treated at Matteawan. The doctor testified that he sought a group evaluation of Dunleavy due to Dunleavy's ability to manipulate and sham, which led the doctor to seek the opinions of other psychiatrists before he recommended transfer.

Dr. Seymour Feldman testified that he was a staff psychiatrist at Matteawan and was licensed by New York in psychiatry. Dr. Feldman testified that he would not return a patient to prison without first lowering the dosages of medication required, which some other doctors had done. Dr. Feldman disagreed with the policy of keeping all aggressive patients in one ward and opined that neither a patient's enunciated wishes nor the fact that he had been in fights should be considered as part of the decision concerning continuation of treatment. Dr. Feldman also acknowledged that both Matteawan and the prison medical staffs are susceptible to "passing the buck" as a method of disposing of extraordinarily difficult cases.

All the psychiatrists denied that the ward altercations or the escape attempt had anything to do with the transfer decisions in plaintiffs' cases. There was also a general agreement that a serious psychosis could not be cured but, at best, the patient experiences a state of remission.[3] The doctors differed significantly among themselves as to the possibility and propriety of Matteaw-

---

**2.** While both Dr. Cakir (whose native language is Turkish) and Hector Cruz (who speaks Spanish) testified in English with some difficulty, Dr. Cakir denied having any problems treating Cruz.

**3.** While plaintiffs argue that they have a right to remain at Matteawan until they have "recovered", this would appear to be impossible medically.

an treating neurotic or personality disorders. Marked differences also appeared as to the causation and regularity of group evaluations and as to Dr. Sweeney's role and activity in transfer decisions. Finally, there appeared to be few standards or objective guidance for the use of the staff personnel who must make transfer decisions.

The Matteawan doctors had a curiously ambivalent attitude toward the aggressively assaultive conduct manifested by most of the plaintiffs in this action. While acknowledging that in extreme instances (a "Jack the Ripper" for instance) such behavior might be symptomatic of psychosis, they seemed to feel that, by and large, it was merely a "personality disorder" (psychopathic personality) and neither treatable nor warranting hospitalization. (Indeed, it was suggested that much of it was caused by homosexual rivalries induced by the open ward confinement situation.)

Whether this tolerant attitude toward aggression is well founded is a medical question that may take years to resolve. But from a prison administration standpoint, they are seemingly dealing with an insoluble dilemma. When a prison inmate continually assaults corrections officers and other prisoners, the prison officials have little difficulty in convincing the two certifying doctors that he is incompetent and in need of hospitalization. If he continues such behavior at Matteawan his status is reviewed and his acts are viewed as either a sign of his recovery, or at least not a psychotic symptom preventing his return to prison. He gets sent back to prison and the roundelay continues.

For the New York State prison inmate the right to treatment for mental illnesses incurred while in confinement is granted by Article 16 of the New York Correction Law. This Article details the situs of hospitalization to be Matteawan State Hospital and delineates the responsible officers and their powers and duties with respect to the mentally ill inmate. Of particular relevance to this case are § 408 and § 410 of the Correction Law. Section 408 provides an extensive array of procedural due process protections for an inmate faced with a transfer to Matteawan. Notice, hearings, representation and review are all rights which must be available to an inmate before the decision to confine him at Matteawan may be carried into execution. Section 410, on the other hand, provides that the treatment of patients of Matteawan shall be terminated when they have "recovered" from their illnesses. These two sections have been recognized by the New York courts as mandating that the Department of Corrections provide treatment for individuals confined at Matteawan. *See Kesselbrenner v. Anonymous*, 39 A.D.2d 410, 334 N.Y.S.2d 738 (2d Dept., 1972), *rev'd on other grounds*, 33 N.Y.2d 161, 350 N.Y.S.2d 889, 305 N.E.2d 903 (1973). Furthermore, the Supreme Court has recently noted that a state prison system's deliberate denial of medical treatment to the convict may constitute a violation of the Eighth Amendment bar to cruel and unusual punishment. *Estelle v. Gamble*, —— U.S. ——, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

In *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment did not entitle a duly convicted state prisoner to a prior hearing in the face of an impending transfer from one correctional facility to another, absent a state law or procedure granting the inmate such a right. The Court declared that not every change in circumstances visited upon a prison inmate must be accompanied by procedural due process notwithstanding the substantially unfavorable impact of the change. In *Meachum* the respondent inmates had brought suit in the District Court protesting their transfer to less favorable prison facilities based upon administrative determinations of prison officials. The lower courts, relying on *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and earlier cases, held that the inmates had a right to a prior hearing before transfer. The Supreme Court, however, reversed, explaining that the interest vindicated in *Wolff* was one based in state law

and, therefore, the federal constitution (through the federal courts) could then be invoked to insure the presence of minimum procedural safeguards. In holding for the state authorities in *Meachum*, the Court explained that the inmates in that case could not point to a specific state law or procedure conditioning transfers upon the occurrence of specific events and, therefore, the inmates could not claim that any due process rights had been violated by transferral without a hearing.

Counsel for defendants argues that *Meachum* limits *Wolff* and denies the mentaly ill inmate *any* hearing right prior to termination of hospitalization by transfer from Matteawan to a correctional facility. However, the defendants' conclusion avoids the critical question established by *Meachum* —does the state law or procedures give the plaintiffs a right for which *Wolff* will require due process protections?

■ *Meachum*, followed upon a number of cases, beginning with *Mempa v. Rhay*, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) and continuing through *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1971) and *Wolff v. McDonnell, supra*, wherein the Supreme Court had enunciated the extent of the properly convicted person's continuing rights to due process of law. This line of cases represents the core of a growing body of law recognizing that the convicted criminal's forfeiture of his liberty by virtue of a just conviction is not synonymous with total forfeiture of all civil and human rights. To the extent that *Meachum* limits these holdings this Court reads the decision to require the complaining state inmate to base his suit upon an underlying right recognized by the state law rather than upon federal standards and rights. The Supreme Court, by *Meachum*, limits the role of the federal courts in prison administration but not in the review of a state's provision of procedural due process to the rights extant in the state's own law. Where a state law protects an individual inmate from grievous

loss, the Due Process Clause still requires that minimum due process protections are established so that the "state created right is not arbitrarily abrogated". *Meachum v. Fano*, supra at 226, 96 S.Ct. at 2539. It remains the function of the federal courts to insure that state promulgated protections for state conferred rights are minimally sufficient.

■ Plaintiffs have acknowledged that an action under Article 78 of the New York Civil Practice Law and Rules may be available for them. *Cf. Solari v. Vincent*, 46 A.D.2d 453, 363 N.Y.S.2d 332 (2d Dept., 1975)[4]; *but cf. Cummings v. Reagan*, 45 A.D.2d 415, 358 N.Y.S.2d 556 (3d Dept., 1974).[5] Yet they contend, and the defendants have not contested, that an exhaustion of their state remedies is not a prerequisite to the 42 U.S.C. § 1983 action. The Court agrees. *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). *Accord, Carr v. Thompson*, 384 F.Supp. 544 (W.D.N.Y.1974). Furthermore, while the right of the mentally ill inmate to treatment is not explicitly set forth in Article 16 of the New York Correction Law, it is sufficiently explicated by the state case law to put to rest any question of the requirement of abstention by a district court under the doctrine enunciated in *Harris County Commissioners Court v. Moore*, 420 U.S. 77, 82–5, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975) and *McNeese v. Board of Education for Community School District 187*, 373 U.S. 668, 673, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1967).

■ New York's law, statutory and case, does recognize the right to treatment of the mentally ill inmate. The Appellate Division, Second Department, of the New York Supreme Court, in its opinion in *Kesselbrenner v. Anonymous, supra*, wrote:

We attach no significance to the omission of the word "treatment" in the mandate to the Department of Correction (Correction Law, § 400, subd. 1) to maintain hospitals for the mentally ill "solely for

---

4. *Reversed as moot,* 38 N.Y.2d 835, 382 N.Y. S.2d 48, 345 N.E.2d 591 (1976).

5. *Reversed as moot,* 36 N.Y.2d 969, 373 N.Y. S.2d 563, 335 N.E.2d 864 (1975).

the purpose of *holding in custody and caring* for such mentally ill persons" (Emphasis added).

In our opinion, the word "care" as used therein includes and imports the "treatment" of such persons.

*Supra* 39 A.D.2d at 417, 334 N.Y.S.2d at 745.

While the New York State Court of Appeals reversed the holding in *Kesselbrenner*, it too was able to state conclusively that Article 16 conferred a right to treatment upon the inmate found to be mentally ill. *Kesselbrenner v. Anonymous*, 33 N.Y.2d 161, 167, 350 N.Y.S.2d 889, 893, 305 N.E.2d 903 (1973). It must be concluded that the detailed mechanics established by § 408 of the New York Correction Law have little meaning in the absence of a right of treatment for those who, under its procedures, are determined to be mentally ill. Moreover, it is difficult to rationalize the detailed due process prior to admission with the total absence of discharge procedures and standards.

In this case there has been absolutely no showing of any procedural safeguards whatever antecedent to the terminations of treatment. Furthermore, the facts presented do not support the conclusion that the terminations of treatment in the plaintiffs' individual cases were even substantively in compliance with the standard enunciated in Section 410 of the Correction Law. While an evaluation by the full Matteawan psychiatric staff was given to Cruz before his transfer, the origin and propriety of Cruz's evaluation is suspect. The timing and context of the several pre-transfer evaluations done on the other plaintiffs make it very likely that the results—decisions to transfer—were foregone conclusions in light of the plaintiffs' prior problems with correctional officers.

Furthermore, the requirement that treating physicians and psychologists be charged with the responsibility of determining which of their patients are transferred and which remain in the hospital is a questionable practice. Such a system leads to abuses by both the treating physician and the patient; either may seek to disguise a recovery or certify one that does not exist for any one of a number of ulterior purposes. The staff physician is under a continuing pressure to "succeed" in his treatment efforts and also must face the complaints of correctional officers about aggressive patients. On the other hand, as the evidence revealed, the doctor may be inclined to tolerate the continued treatment of a recovered patient if that person serves to assist the overall mission of the hospital or has a demonstrated inability to cope with the prison environment. The patient, in turn, may seek to disguise his symptoms and resist treatment if he feels that his physician may one day have to be the cause of a transfer back to prison. Such a specter of an adversarial relationship is no less harmful in the context of a hospital than it is in other similar correctional circumstances. *Cf. Morrissey v. Brewer*, 408 U.S. at 485–6, 92 S.Ct. 2593.

The facts presented in this case also demonstrate that different physicians may have radically different views of both a given inmate's illness and the need for and possibility of treatment of any given mental illness. The evidence further suggests that, in any given transfer decision, wholly extraneous influences may be dispositive factors. Society in general, and New York in particular, has long ago ceased the exploitation and arbitrary abandonment of its disabled citizens. It is no less wrongful for society to arbitrarily dispose of the sick of mind than the lame of body. *Cf. United States ex rel. Schuster v. Herold*, 410 F.2d 1071 (2d Cir. 1969). It is no less wrongful to arbitrarily begin and end a course of treatment for one convicted of a crime than for one who has not been so convicted. *Cf. Estelle v. Gamble, supra.* Treatment is mandated under Section 408 and the New York case law and while Matteawan authorities certainly should be permitted to transfer inmates who are recovered, the manner in which such transfers have been handled in plaintiffs' cases sufficiently demonstrates that the state right to treatment is being arbitrarily abrogated and

that the safeguards provided are not minimally satisfactory under the Due Process Clause of the Fourteenth Amendment.

The State also presented Dr. Jack Wright, Assistant Commissioner of Mental Hygiene, who testified that the methods of treatment at Matteawan had been changed so that team evaluations were used instead of rotating assignments and that the use of a separate evaluation ward was being discontinued. Dr. Wright also described several further reorganizational steps that are planned for Matteawan's population. The planned changes include the operation of six mental health facilities at or near six major correctional facilities and the transfer of responsibility for mental health programs for prisoners to the Department of Mental Health. While the changes described are laudatory and may relieve many treatment shortcomings, they are as yet merely plans for the future and not relief for the plaintiffs' current complaints.[6]

■ Plaintiffs, based on existing cases prior to the Supreme Court's decision last summer in *Meachum v. Fano, supra*, pray for an extensive array of procedural safeguards. However, both parties paid scant attention to the question of what procedural safeguards are appropriate and feasible in the transfer decisions. The Court is reluctant, in such a situation, to limit the administrative options of the Department of Corrections without first allowing the defendants the opportunity to suggest improvements in the procedures presently employed. The preferred course, and the one selected, is to allow the defendants, or their successors in office, the opportunity to construct an administrative process that is in keeping with the fundamentals of the Due Process Clause. It is expected that the procedures established will include, at a minimum: written notification to the inmate of the transfer decision and its factual basis; identification of the decision makers; ending the use of the treatment staff as the sole decision makers; and some type of

professional review which will be free from administrative pressures.

Within sixty days, the defendants shall submit to this Court written guidelines providing all feasible and appropriate procedural safeguards as mandated by the Due Process Clause and this decision.

SO ORDERED.

---

6. We are advised that the location and positions of many of the plaintiffs have changed.

Consequently, the matter of individual relief is not being considered at this time.