558 F.2d 658
 Hector CRUZ, Matthew Gulley, Carmine Perrelli, George
Dunleavy, Louis Poveromo, Nicholas Pechar, and George
Mitchell, Individually and on behalf of all other persons
similarly situated, Plaintiffs-Appellees,
v.
Benjamin WARD, Individually and in his capacity as
Commissioner of the New York State Department of
Correctional Services, Vito M. Ternullo, Individually and in
his capacity as Director of Matteawan State Hospital,
Lawrence Sweeney, Individually and in his capacity as Chief
of Psychiatric Services at Matteawan State Hospital,
Defendants-Appellants.
 No. 946, Docket 77-7043.
 United States Court of Appeals,
Second Circuit.
 Argued April 6, 1977.
Decided June 23, 1977.
 
 Jane E. Bloom, Poughkeepsie, N. Y. (Mid-Hudson Valley Legal Services Project (Monroe County Legal Assistance Corp.), Poughkeepsie, N. Y., on the brief), for plaintiffs-appellees.
 Arlene R. Silverman, New York City (Louis J. Lefkowitz, Atty. Gen., and Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, on the brief), for defendants-appellants.
 Before KAUFMAN, Chief Judge, LUMBARD and VAN GRAAFEILAND, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 This is an appeal from a judgment by Judge Goettel of the Southern District holding that New York State has been violating the fourteenth amendment by returning mental patients from hospital to prison without adequate procedural protections. We conclude that the inmates have not been deprived of due process or subjected to cruel and unusual punishment and accordingly we reverse.
 
 
 2
 * State prison inmates adjudged in need of institutional care for mental illness are sent to Matteawan State Hospital, which is part of a medium-security facility in Beacon, New York.[1] Although New York law provides elaborate procedural protections prior to involuntary transfers from prison to mental hospital, there are no statutory procedures mandated for transfers back to prison.[2] In October 1975 patients and former patients at Matteawan brought a class action alleging that transfers from the hospital back to prison had violated their rights under the due process clause and under state law. That winter, five of the plaintiffs and seven Matteawan physicians testified at four days of hearings. Judge Goettel's findings are set forth in his opinion at 424 F.Supp. 1277.
 
 
 3
 The transfer decisions are made only after evaluations. An evaluation of each patient at Matteawan is conducted by a staff psychiatrist every month or two. The interview lasts roughly twenty minutes, after which the doctor spends a few minutes writing down his observations and recommendations as to treatment. Although a number of evaluations used to be performed by psychiatrists who had not had any significant prior exposure to the particular patient, since the spring of 1974 it has been the hospital practice for each evaluation normally to be conducted by the ward doctor who has been responsible for the patient's treatment. In some wards, the doctor conducts his evaluations on a team basis, in consultation with other members of the ward staff.
 
 
 4
 The examiner has access to the patient's commitment papers, reports of previous evaluations, and reports of any major disturbances. It appears that informal notes are sometimes made by treating psychiatrists, correctional officers, social workers, and nurses, but such notes are kept to a minimum for confidentiality purposes and it is not clear that they are ordinarily consulted by the interviewer.
 
 
 5
 The evaluation procedure is flexible. Sometimes more than one psychiatrist may interview the patient; if the examining psychiatrist has not been the one responsible for the patient's treatment, the treating physician will sometimes set forth his own opinion in a letter. Written recommendations may also be offered by other members of the patient's ward team. Evaluations may be scheduled out of turn if there is some reason why a prompt decision in his case seems desirable.
 
 
 6
 If the evaluating psychiatrist recommends a return to prison, his report is reviewed by the hospital's chief of psychiatric services, Dr. Lawrence Sweeney. Defendant Sweeney testified that he had personal knowledge of many of the hospital's patients whom he saw on his tours of the wards, and that on occasions he had disagreed with an interviewer's conclusions and had asked for another evaluation.
 
 
 7
 Although the hospital has no formal written or oral guidelines on when a patient should be returned to prison, the doctors testifying seemed to be in general agreement about the principal criteria. They identified the crucial questions as whether the patient is in contact with reality and reacts to the world in a rational manner, and whether his condition may be improved through further hospitalization. The borderline cases are patients who are not psychotic but have neuroses, personality disorders, or other psychological problems which some psychiatrists believe are treatable and some not, and which may or may not be aggravated by a return to prison. Several of the doctors testified that because of uncertainties in following up on patients after their return to prison and concern about the destructiveness of the prison environment, they tend to let borderline patients stay on at Matteawan somewhat longer than would otherwise be medically mandated. However, if such a patient becomes disruptive and potentially dangerous to other patients and hospital personnel, or if he tries to take advantage of the relatively low security at the hospital in order to escape, the doctors may conclude that it would be better for him to be back in prison where he can be more readily controlled. Thus, if a patient's involvement in a fight is considered not to be a symptom of mental illness, it can result in his being transferred to prison.
 
 
 8
 Relying primarily on their own experiences, the plaintiffs contended at trial that a number of transfer decisions were being made arbitrarily, out of spite, or simply as punishment for misbehavior. Plaintiffs Gully and Cruz were first admitted to Matteawan in January 1974 after attempts at suicide. Plaintiff Poveromo was admitted in September 1974. Gully and Poveromo were returned to prison shortly after they were involved in a fight in their ward in January 1975. Within a few weeks (during much of which time they were confined in stripped cells), the prison authorities sent them back to Matteawan. Gully and Cruz were involved in another fight in October 1975, and after the incident they were evaluated by a group of six staff psychiatrists while in restraining sheets, and thereafter returned to prison.
 
 
 9
 Plaintiff Dunleavy arrived at Matteawan in April 1974. A year later, and six weeks after a brief escape from the hospital, he was returned to prison. Within a month, he slashed his wrists and was returned to Matteawan.[3]
 
 
 10
 Plaintiff Mitchell arrived at Matteawan in September 1974. On October 10, 1975 he was evaluated by a staff psychiatrist who diagnosed him as recovered. When told by a corrections officer that he was to be transferred back to prison, Mitchell "went beserk" and had to be placed in a strait jacket. According to Mitchell's testimony, he attempted suicide several times while waiting to be returned to prison, but the transfer was nevertheless carried out. After two weeks at prison, he was returned to Matteawan.
 
 
 11
 The district court concluded that the procedures being followed to protect patients' right to treatment were unsatisfactory.[4] Judge Goettel found that the decisions to transfer the plaintiffs had "very likely" been "foregone conclusions in light of the plaintiffs' prior problems with correctional officers." He determined that, at a minimum, due process must include written notification to the inmate of the transfer decision and its factual basis, identification of the decision-makers, and review of the transfer decision by a professional who is not a member of the hospital staff.[5]
 
 II
 
 12
 We disagree with the district court's assessment of the requirements of procedural due process and conclude that no violation has been demonstrated in this case.[6] Nor do we think the plaintiffs have suffered cruel and unusual punishment.
 
 
 13
 The ingredients of due process depend on the interests at stake and the nature of the issues to be resolved. See generally Note, Specifying the Procedures Required by Due Process: Towards Limits on the Use of Interest Balancing, 88 Harv.L.Rev. 1510, 1514 (1975). Due process does not require formal hearings and inflexible guidelines under all circumstances. See Cafeteria Workers Union v. McElroy, 367 U.S. 886, 894-95, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Haymes v. Regan, 525 F.2d 540 (2d Cir. 1975).
 
 
 14
 (I)dentification of the specific dictates of due process generally requires consideration of . . . the private interest that will be affected . . . , the risk of an erroneous deprivation of such interest . . . and the probable value, if any, of additional . . . procedural safeguards, and, finally, the government interest, including the function involved and the fiscal and administrative burdens that the additional procedural requirement would entail.
 
 
 15
 Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).
 
 
 16
 Another constraint on state actions affecting the health of prisoners is the prohibition against cruel and unusual punishments. Because an ill inmate must rely on his warder's aid, the state has a duty to supply him with medical care. Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Deliberate indifference to a prisoner's serious medical needs violates the eighth amendment. Id. at 103-06, 97 S.Ct. 285. Such indifference may occur on an individual level, such as when a doctor intentionally mistreats an inmate, see id. at 104 n. 10, 97 S.Ct. 285, or on an institutional level, when the prison's system of medical care is so seriously inadequate as to cause unwarranted suffering, see Bishop v. Stoneman, 508 F.2d 1224, 1226 (2d Cir. 1974); Todaro v. Ward, 431 F.Supp. 1129 (S.D.N.Y.1977).
 
 
 17
 In the present case, the record does not support a finding that transfer decisions have been made in bad faith, out of pique, or on irrational grounds. Proof that a few patients who were transferred from the hospital were returned to it shortly thereafter does not mean that these patients have been unfairly treated. No psychiatrist is a clairvoyant; some diagnoses that are perfectly defensible at the time will, in retrospect, turn out to be erroneous. Also, since many psychological judgments are highly subjective, it is to be expected that prison physicians should sometimes disagree with the opinions of the hospital staff.
 
 
 18
 Although it would clearly be cruel and unusual to deprive a patient of needed psychiatric care simply in order to punish him for misconduct, the record in this case does not indicate that the transfers were punitive. A few inmates who had been at the hospital for a number of months and whose need for continued hospitalization was considered questionable were transferred to prison shortly after they became embroiled in fights or attempted to escape. When an inmate abuses in this manner the relative freedom afforded him in the hospital environment and threatens the welfare of other patients and hospital personnel, it is clearly appropriate for the staff to reassess his mental condition in order to determine whether continued treatment at the hospital is truly necessary for him or unduly hazardous to others. Thus, it would be too speculative for the district court to presume that these particular transfer decisions were punitive or otherwise contrary to reasonable medical standards.
 
 
 19
 The nature of the medical judgments involved in this case and the context in which they are made render them peculiarly unsuited to procedural structuring by a court. Compared with other fact-finding processes, the practice of psychotherapy is highly subjective. Since two qualified psychotherapists examining the same patient can reach different conclusions as to malady and cure without either conclusion being demonstrably incorrect, diagnostic consensus is an elusive and sometimes illusory goal. The decision to dehospitalize an inmate is made by a trained physician who is involved in the day-to-day treatment at the hospital, and it is reviewed by the hospital's chief psychiatrist. Under these circumstances, the marginal value of a third professional opinion seems questionable. The arguments in favor of requiring review by outside parties are weaker here than in the commitment context, cf. United States ex rel. Schuster v. Herold, 410 F.2d 1071 (2d Cir.), cert. denied, 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969), since here the patient has been subject to protracted observation by the hospital treatment staff. In making their evaluations the doctors have recourse to the records of prior evaluations which have accumulated over the course of the patient's stay; in most cases, they will have participated in the patient's treatment. Thus, they are in an especially good position to reach an informed conclusion about the patient's condition. In addition, keeping the evaluation process flexible and informal may enhance the opportunities for input from other staff members.
 
 
 20
 A statement of reasons and assistance of counsel prior to transfer might do more harm than good. These safeguards, designed for traditional fact-finding and dispute resolution, are much less functional where the issue is whether a doctor thinks his patient requires further treatment. There is also a danger that both these devices could prove to be antitherapeutic in many cases. Moreover, too much concern about precedent may interfere with the effective exercise of administrative and medical discretion. For example, the hospital appears to have the capacity to allow a few patients like plaintiff Dunleavy to stay on beyond their normal return dates simply because they are happier at the hospital and they serve a useful liaison function with the other patients; however, if forced to formalize this transfer policy, the hospital might be hardpressed to devise a workable rule. Finally, in view of our concern about unnecessary hospitalization for mental illness, see, e. g., O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); United States ex rel. Schuster v. Herold, supra, 410 F.2d at 1078-79, 1087, we should hesitate before erecting additional procedural obstacles to stand in the way of the termination of such hospitalization.
 
 
 21
 We also have trouble with the district court's requirement that in every case the inmate be given notice of his impending transfer. A possible problem with advance notice is that an inmate who knows he is about to be returned to prison may, in the words of defendant Sweeney, "go back to his ward and blow his stack and get everybody else upset." Whether such notice would substantially enhance the decision-making process or ease the trauma of adjustment for the transferred inmate is a matter of conjecture. Clearly, however, the pros and cons of notice policy are a subject that is better left to the judgment of the doctors at the hospital.
 
 
 22
 The proposal that the hospital be required to promulgate guidelines suffers from similar infirmities. Since the basic criteria already being applied by the doctors seem fairly sound and uniform, see pages 4400-4401 supra, we doubt that written guidelines will serve much point. On the other hand, discouraging minority views among the staff may in some circumstances be harmful; formal guidelines may carry with them the evils of rigidity. Thus, we conclude that the net benefits which might accrue from these additional procedural safeguards are much too uncertain to warrant a finding that their implementation is mandated as a matter of due process.
 
 
 23
 Accordingly, the order of the district court is reversed and the case is remanded with instructions that plaintiffs' complaint be dismissed.[7]
 
 IRVING R. KAUFMAN, Chief Judge (dissenting):
 
 24
 With all due deference to my colleagues, the majority opinion has glossed over the clear implication of the record that responsible officials at the Matteawan State Hospital have regularly returned mentally ill patients to prison for punitive reasons, to languish in solitary confinement without even a semblance of medical care. Reasoning on the basis of a critical and unwarranted factual misapprehension, my brothers conclude that the State of New York need not adopt standards and minimal procedural safeguards to assure in the future that decertification is recommended solely for medical reasons. I believe that the opinion signals an unfortunate retreat from hard-won judicial recognition of important human rights. Accordingly, I dissent.
 
 I.
 
 25
 The majority opinion all but ignores the factual findings of the district court. Judge Goettel, after conducting four days of hearings at Matteawan State Hospital for the Criminally Insane and in New York City, specifically found that "the facts presented do not support the conclusion that the terminations of treatment in the plaintiffs' individual cases were even substantially in compliance with the standard enunciated in Section 410 of the Correction Law."[1] 424 F.Supp. 1277 (S.D.N.Y.1976). Judge Goettel also found that the decisions to transfer the appellees to harsh prison conditions "were foregone conclusions in the light of the plaintiffs' prior problems with correctional officers." Id. Citing the incessant pressure on staff physicians to prove success by certifying "recovery" and, in addition, to mollify beleaguered hospital guards who complained of assaultive patients, the district court held that the appellees' constitutional rights had been arbitrarily abrogated and that existing safeguards against punitive transfers were not even minimally satisfactory. Putting aside the deference traditionally accorded the district judge, who is in a superior position to evaluate credibility, cf. United States v. Leonard, 524 F.2d 1076, 1092 (2d Cir. 1975), cert. denied, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976), a fair reading of the record provides ample support for his conclusion that the transfers at issue here were vindictively motivated.
 
 
 26
 In 1968 Matthew Gulley was imprisoned at Attica Correctional Facility under a ten-year sentence.[2] Beset by hallucinations and the victim of several suicide attempts, Gulley was admitted to Matteawan in 1974. He was diagnosed as a psychotic with borderline mental retardation. Treatment included prescriptive medication, psychological counseling and monthly psychiatric evaluations. From the beginning, the hospital staff considered him a disciplinary problem. In January, 1975, soon after Gulley was observed fighting with another inmate, Dr. Seymour Feldman noted that it might be necessary to return Gulley to a regular prison facility if he persisted in his belligerence. Dr. Lawrence Sweeny, Chief Psychiatrist at Matteawan, apparently concurred in this appraisal of the proper course of treatment, for after Sweeny evaluated Gulley on February 13 and 14 the appellee was transferred without notice to Clinton Correctional Facility where he was confined in a "stripped cell"[3] for 24 hours a day without medication or adequate professional assistance.
 
 
 27
 In just two weeks, Gulley was recertified from Clinton to Matteawan where he resumed his former regimen of medication and regular psychiatric guidance. In July, 1975 the hospital authorities secured a retention order.[4] On October 9, a staff psychiatrist, after a scheduled evaluation, recommended still further retention of Gulley. But eight days later Gulley engaged in a violent altercation and because of it was placed in a restraining sheet in the jail ward. On October 20 an ad hoc committee of staff psychiatrists in a clear breach of the institution's custom and practice "evaluated" Gulley for three minutes while he was still confined in a restraining sheet and pronounced him recovered. Cf. N.Y. Corrections Law § 410. This diagnosis, not surprisingly, contradicts a written psychiatric evaluation of the same date, which notes:
 
 
 28
 The patient was last evaluated on October 9, 1975. Since then his condition seems to be the same except on one occasion he was involved in an unpleasant incident.
 
 
 29
 Gulley's final diagnosis was "borderline mental retardation, personality disorder."
 
 
 30
 Louis Poveromo was imprisoned at Greenhaven Correctional Facility when, in September, 1974, he was adjudged mentally ill and transferred to Matteawan for treatment. Upon his arrival there Poveromo was diagnosed as psychotic and drug dependent. The court granted an official request for retention in January, 1975. Later that same month the appellee was involved in a fight with correctional officers and immediately thereafter branded a "troublemaker" for whom Matteawan had "no more to offer." This resulted in invocation of the talismanic word "recovered" and a nine day stint in the stripped cell at Clinton, after which Poveromo was again returned to Matteawan. Swift recertification in this instance was to be expected, however, since a staff psychiatrist had recommended retention and further treatment of Poveromo only two days before he was transferred to Clinton.
 
 
 31
 A familiar and similar pattern of retribution for aggressiveness and deliberate withholding of desperately needed medical attention is evident in the cases of Hector Cruz, George Mitchell and George Dunleavy. Cruz was admitted to Matteawan in January, 1974 after he tried to hang himself, and was diagnosed as "schizophrenic, residual type." On September 17, 1975 a staff psychiatrist concluded, after a regularly scheduled evaluation, that Cruz required further hospitalization. One month later he was involved in an altercation on his ward. A perfunctory evaluation by six psychiatrists on October 20 revealed that Cruz had "recovered," although his final diagnosis disclaims any change in his schizophrenia. Mr. Mitchell's case followed the same formula. He was transferred out of Attica where he had been "hearing voices and seeing visions." Following a fracas, Mitchell was informed of the decision to remove him from Matteawan, and "went beserk." He was led to the hospital's Transfer Unit in a strait jacket. Despite two subsequent suicide attempts and a contrary recommendation from the psychiatrist most familiar with his condition, Mitchell was sent to Clinton. After two weeks there he was recertified to Matteawan. Dunleavy, according to the testimony of Dr. Ali Sirman, is merely neurotic, a fact in which the majority apparently finds solace for its unfounded innuendo that all of the appellees are malingerers. In any event, it is undisputed that Dunleavy attempted to commit suicide by slashing his wrists after he was transferred to Greenhaven Correctional Facility as punishment for an unsuccessful effort to escape the "comforts" of Matteawan. Thereafter, Dunleavy was recertified to the hospital, whose staff requested a retention order in November, 1975.
 
 
 32
 Further evidence confirming the existence of an almost sadistic propensity to shuttle unruly inmates between Matteawan and the stripped cells of the state's prisons can be elicited from the testimony of several staff psychiatrists. In response to the court's inquiry whether it was standard procedure to reevaluate a patient who was involved in an assault on correctional personnel, Dr. Feldman stated that "it is not standard procedure. It is one hundred percent." Dr. VicArthur Factora acknowledged that he regularly considered whether a patient engaged in altercations in arriving at a decertification recommendation. With all due respect for my able brother Lumbard's concern not to meddle in highly subjective medical judgments, we can neither ignore nor condone the overwhelming weight accorded to clearly non-medical factors in the dehospitalization decisions before us.
 
 
 33
 The district court was aware of the "insoluble dilemma" posed by assaultive prisoners so long as standards for decertification did not exist. The record is clear that prison authorities have little difficulty convincing two physicians that incorrigible inmates are incompetent and in need of hospitalization; and Matteawan officials seem to be equally adept at shuttling human beings back to prison because their aggressive violence evidences "recovery". This roundelay, of course, often can result in the cruel injustice portrayed in the instant case, where persons like Mitchell, desperately in need of psychiatric treatment, are condemned to solitary confinement where their medical needs are callously ignored. Or, to quote Dr. Feldman:
 
 
 34
 This is known as passing the buck. It is a very common thing . . . and unfortunately, we have it to an extraordinary degree.
 
 II.
 
 35
 I do not understand my brothers to disagree that the appellees have a constitutionally protected interest in remaining at Matteawan until they are psychologically fit to return to the general prison population. Indeed, the majority is compelled to this view by state law, which forbids reimprisonment of inmates who have not "recovered," N.Y.Corr.Law § 410, cf. Kesselbrenner v. Anon., 39 A.D.2d 410, 334 N.Y.S.2d 738 (2d Dept. 1972), rev'd on other grounds, 33 N.Y.2d 161, 350 N.Y.S.2d 889, 305 N.E.2d 903 (1973); U. S. ex rel. Schuster v. Herold, 410 F.2d 1071 (2d Cir.), cert. denied, 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969), and by the Eighth Amendment proscription of wanton indifference to a prisoner's medical needs. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).[5] Therefore, my colleagues' inexplicable belief that due process was accorded the appellees must be based upon their failure to give credence to Judge Goettel's amply supported factual findings which make out a plain case of deliberate, punitive transfers of mentally ill human beings.
 
 
 36
 I understand my brothers' reluctance to question the professional judgment of psychiatrists. Nevertheless, until now, courts have not been dissuaded from investigating a possible denial of due process simply because a doctor or psychiatrist is involved. Surely it is too late in the day to argue that a mere unarticulated medical judgment, without a written statement of reasons that can withstand judicial scrutiny, is sufficient to support a decision to commit a prisoner to an insane asylum. Cf. U. S. ex rel. Schuster v. Herold, supra. We cannot blind ourselves to the deplorable condition of many mental hospitals and the shocking practices revealed in the record before us. When one of the staff physicians at Matteawan testifies that only a uniform "manual of procedures" will prevent further proliferation of the "slipshod" practices that ensue from the unstructured exercise of individual discretion, it surely will not do for a federal court to rely upon "professional judgment" without more.
 
 
 37
 I also emphatically disagree with the majority's bland assessment that a mere vague "general agreement about the principal criteria (for recommending return to prison)" is an adequate substitute for clear guidelines. Rather, I would credit the expert testimony of Dr. Jack Wright, the Assistant Commissioner for the New York State Department of Mental Hygiene currently charged with improving services at Matteawan, that it is possible to articulate medically acceptable and reasonably objective decertification factors. Only by removing the secrecy that shrouds decisions to dehospitalize prisoners can we hope to avoid repetition of the crass injustice uncovered in the instant case.
 
 
 38
 My colleagues' concern impels me to address the question of the remedy to be afforded mentally ill prisoners whose constitutional rights have been flouted. I agree that we should avoid a "battle of psychiatrists." Nevertheless, I believe that the punishment of unruly mental patients by systematic transfers to stripped cells where they are deprived of desperately needed medical attention as specifically found by Judge Goettel in this case cannot be eradicated or even reduced in the future without a minimum of intrusion by the federal courts. I do not believe it would be unduly vexing for the State to propound a set of guidelines delineating the type of inmate who would benefit from Matteawan, and the purposes that the institution seeks to achieve. Such guidelines would, of course, include a statement of permissible and impermissible grounds for transfer to prison. I certainly would not consider it improper for the State of New York to declare that positively incorrigible and dangerously violent inmates who interfere with the treatment of others need not be housed at Matteawan. On the other hand, I should think that a direction to transfer a mildly aggressive person to solitary confinement without medication, particularly by an annoyed and irritated prison official, is clearly improper.
 
 
 39
 I would also require at a minimum that the treating physician who makes the transfer decision state in writing his reasons for it and his factual basis. I do not believe that this statement of reasons need be analyzed or approved by an outside physician. I would merely propose that the statement be placed in the transferee's file for later administrative review. This will be the crucible for testing the good faith of the staff psychiatrist. Review, of course, may be had in a state Article 78 proceeding if the inmate claims an abuse of administrative discretion. As long as the appropriate procedural rules were followed, Section 1983 would be available only when utter disregard for the transferee's legitimate medical needs could be shown as in the instant case.
 
 III.
 
 40
 Federal courts, quite properly, are reluctant to interfere with the operation of state prisons. Nevertheless, the meager funds of a state's treasury and a state's pride in its autonomy will not excuse trampling underfoot the constitutional rights of its citizens. There are some powers that a state may not retain; there are some economies that a state may not demand. We will not blithely intrude on the state's preserve. But, once a constitutional violation has been convincingly established, we are required by the Constitution to overcome our timidity. I believe we should do so here.
 
 
 
 [1]
 At Matteawan, roughly 300 patients were housed in twelve wards. In 1971 the hospital staff included fifteen psychiatrists; by 1975 the number was seven. Limited psychiatric services were also available at each of the other state prisons. New York's state prison population is approximately 17,000
 Pursuant to recent New York legislation, responsibility for treatment of mentally ill inmates shifted from the department of correctional services to the department of mental hygiene as of April 1, 1977. The new legislation also calls for the establishment of small mental health centers to provide outpatient services at a number of state prisons. N.Y. Corrections Law § 401 (McKinney Supp.1976).
 
 
 [2]
 Commitments are governed by N.Y. Corrections Law § 402 (McKinney Supp.1976), which is substantially a recodification of what used to be N.Y. Corrections Law § 408 (McKinney Supp.1975). If a prison physician believes an inmate is "mentally ill," a judge will appoint two outside physicians to make an independent examination. § 402, P 1. After the examination, five-days notice must be served on the prisoner and on his nearest relative or a friend. Id. P 3. A hearing may be required on behalf of the inmate, and the judge has discretion to examine the inmate for himself. Id. P 5. The person committed also has a right ultimately to a jury trial on the question of his mental illness. Id. P 10. Under § 410 of the old law, a patient could be returned to prison only upon certification by the superintendent of Matteawan that he had "recovered." This purely formal requirement has not been abolished
 
 
 [3]
 According to an article in The New York Times on May 22, 1977, at page 35, Dunleavy has again escaped from Matteawan, along with Poveromo and numerous other prisoners
 
 
 [4]
 In a similar case, Burchett v. Bower, 355 F.Supp. 1278 (D.Ariz.1973), the district court reached basically the same result as that reached by the district court here. Pretransfer procedures were also required by the court in Romero v. Schauer, 386 F.Supp. 851 (D.Colo.1974) (three-judge court), but that case is distinguishable since (1) it involved transfers to prison of mental hospital patients who had never been sentenced to prison and (2) the transfers were based not on a finding that the patients no longer needed treatment but rather on a finding that they were so insane as to be too dangerous for continued confinement at the hospital
 
 
 [5]
 For purposes of framing injunctive relief, Judge Goettel has asked the defendants to submit proposed procedures to him. We need not reach the question whether his decision as it stands at present is appealable as a final order, see generally Arthur v. Nyquist, 547 F.2d 7 (2d Cir. 1976); Hart v. Community School Board, 497 F.2d 1027, 1031-32 & n. 4 (2d Cir. 1974), since certification and leave to appeal under 28 U.S.C. § 1292(b) have been granted
 
 
 [6]
 In reaching its decision, the district court interpreted New York law as granting prison inmates a right to adequate psychiatric treatment. Cf. Kesselbrenner v. Anonymous, 33 N.Y.2d 161, 167, 350 N.Y.S.2d 889, 893, 305 N.E.2d 903 (1973), rev'g 39 App.Div.2d 410, 334 N.Y.S.2d 738 (1972); Dunleavy v. Wilson, 397 F.Supp. 670, 673 (S.D.N.Y.1975). Appellants take issue with this finding, and they argue that inmates who have no legally protected liberty or property interest in receiving psychiatric treatment are not entitled to due process prior to the termination of their hospital stay, see Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Appellees defend the district court's interpretation of New York law and contend that, in any event, the right to procedural due process is triggered by a prisoner's eighth amendment entitlement to adequate medical care. Since we find the state's existing procedures to be constitutionally adequate, we do not reach any of these other questions
 
 
 [7]
 Appellees contend that inmates have been returned to prison because of their involvement in organizational activity and litigation. The only testimony regarding any alleged first amendment violations, however, was that one staff psychiatrist told plaintiff Dunleavy he might be transferred if he continued to be involved in litigation. As Dunleavy has remained both in this law suit and in the hospital, it seems clear that any threat against him has not chilled the exercise of his rights and has not been carried out. Accordingly, we do not think the record supports appellees' request for a remand on this claim
 
 
 [1]
 The statute provides, in relevant part
 Whenever any prisoner, who shall have been confined in such hospital as (an insane) person, shall have recovered before the expiration of his sentence, and the superintendent shall so certify in writing to the agent and warden or other officer in charge of the institution, from which such prisoner was received or to which the commissioner of correction may direct that he be transferred, such prisoner shall forthwith be transferred to the institution from which he came by the superintendent of the hospital, or if received from one of the state prisons, to such state prison as the commissioner of correction may direct; and the warden or other officer in charge of such institution shall receive such prisoner into such institution, and shall, in all respects, treat him as when originally sentenced to imprisonment.
 N.Y. Correction Law § 410 (emphasis supplied).
 
 
 [2]
 The fact that parole release is rarely, if ever, granted inmates of Matteawan appears to undercut the argument that Gulley, after serving nearly two-thirds of his maximum term, was a "malingerer" whose only goal was to remain incarcerated in the relative "luxury" of the hospital. Moreover, it is undisputed that the vast majority of prisoners assiduously strive to avoid the stigma of being declared insane. This understandable desire, of course, is the genesis of the legion of judicial decisions affording procedural due process in commitment determinations. See e. g. U. S. ex rel. Schuster v. Herold, 410 F.2d 1071 (2d Cir.), cert. denied, 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969)
 
 
 [3]
 The stripped cell at Clinton is a windowless room, devoid of all furnishings except a sink, toilet and mattress. The only clothing permitted a prisoner is a pair of underwear
 
 
 [4]
 Dr. Sweeney testified that he was required to seek a retention order every six months to prevent the automatic return of a patient to the general prison population. Unless the prisoner acquiesced in retention at Matteawan, hospital officials were required to support their application in an adversary proceeding pursuant to N.Y. Correction Law § 408
 
 
 [5]
 The Supreme Court has instructed us that an inmate does not ordinarily enjoy a constitutionally cognizable interest that will prevent his transfer from prison to prison absent some right or expectation rooted in state law. Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). The majority, by addressing the question whether the instant system of transfers without hearings or other procedural safeguards resulted in the arbitrary abrogation of a state created right to treatment, see Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), recognizes that due process requires some protection for potential transferees