Chief Judge Fuld.
On this appeal, we are required to determine the constitutionality of a statute (section 85 of former Mental Hygiene Law [now section 29.13 of the new Mental Hygiene Law]) insofar as it mandates that “dangerously mentally ill ” patients in civil State hospitals — whose con *163 finement is not based on criminal charge or conviction — be transferred to Matteawan State Hospital, a correctional faeih ity primarily for mentally ill convicted criminals.[1]
Section 85 of the former Mental Hygiene Law — in effect until shortly after the present appeal was taken — authorized the director of any State hospital to ask the court for a two-physician examination of a patient who is “so dangerously mentally ill that his presence [in the] hospital is dangerous to the safety of other patients therein, the officers or employees thereof, or to the community ”. If the physicians certified to such dangerous mental illness, the director — the statute recited — “ shall thereupon apply ” to the court for an order placing the patient in Matteawan. Notice to the Mental Health Information Service and to the patient or his relatives was required, as well as a hearing on demand. If the patient was found to be dangerously mentally ill, the statute continued, the judge “ shall forthwith issue his order hospitalizing him in the Matteawan state hospital ”. Retention for longer than six months was subject to court authorization and periodic court review (subd. 4-a). The section applied only to dangerously mentally ill patients at State hospitals, but not to such patients in other types of facilities — municipal hospitals, voluntary general hospitals or privately licensed institutions.[2]
The petitioner-respondent is Director of Manhattan State Hospital, a State hospital under the Department of Mental Hygiene, where the respondent-appellant is a patient. Two physicians having certified, pursuant to section 85, that the appellant was “ dangerously mentally ill,” the petitioner brought this proceeding for an order directing his placement in Matteawan State Hospital. The record discloses that the appellant, who was first admitted to Manhattan in 1969 at the age of 18, has been in and out of that institution since then. *164 During this time, he committed a number of unprovoked assaults on members of his family when at large and on fellow patients and staff members when in the hospital. At the hearing to decide upon his placement in Matteawan, the diagnosis of his illness was given as “ schizophrenia, chronic, undifferentiated ”, and he was described as “ delusional, sometimes hallucinatory ”. The three doctors who testified all agreed that at the present time he was “ dangerously mentally ill ” and should be on maximum security in a closed ward. Two of them, however, felt that his condition could “ come to a halt ” or “ change,” and one testified that he would not be dangerous with proper medication and treatment, should not be transferred from Manhattan and, indeed, when given sympathetic and interested care, “ appeared to be quite manageable on the ward ”. As a matter of fact, he had in one instance voluntarily committed himself.
Although there was testimony that Manhattan does not have a “ closed ward,” the record reveals that there are security wards in at least two other State hospitals in the metropolitan area — Bronx State and Central Islip State Hospitals — and a new maximum security State hospital in Beacon — Mid-Hudson Center — housing, among others, dangerously mentally ill patients who have been charged with commission of crimes, whose terms of imprisonment have expired or who are entitled to conditional release.
After the hearing, the court at Special Term (69 Mise 2d 181), although finding the defendant “ dangerously mentally ill ”, refused to commit him to Matteawan. It was its conclusion that the direction in the statute for the commitment of a mentally ill civil patient, charged with no crime and in no way involved in the criminal process, to a “ correctional mental facility” violates the Equal Protection and Due Process Clauses of Federal and State Constitutions.
The Appellate Division, by a divided court, reversed and ordered the appellant committed “to an appropriate institution in the State Department of Correction ” (39 A D 2d 410, 420). The majority were of the opinion that patients in Matteawan were afforded treatment “ commensurate with the needs ” of “ dangerously mentally ill ” civil patients. Dissenting Justices Shapibo and Christ opined — and we are in *165 accord with their view — that the confinement in Matteawan of a dangerously mentally ill person, not charged with or convicted of a crime, is “ constitutionally invidious ” (p. 428).
To subject a person to a greater deprivation of personal liberty than necessary to achieve the purpose for which he is being confined is, it is clear, violative of due process. (See, e.g., Jackson v. Indiana, 406 U. S. 715, 738; Humphrey v. Cady, 405 U. S. 504, 514; Robinson v. California, 370 U. S. 660, 666; Inmates of Suffolk County Jail v. Eisenstadt, 360 F. Supp. 676, 686, 688; United States ex rel. Daniels v. Johnston, 328 F. Supp. 100, 111-116.) “ Due process requires ”, the Supreme Court has recently declared, in connection with the commitment of a mentally ill person accused of crime, “ that the nature and duration of the commitment bear some reasonable relation to the purpose for which the individual is committed ” (406 U. S., at p. 738). And, continued the court, “ a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant.”
The principle enunciated in Jackson points the conclusion here. The appellant is mentally ill, albeit dangerously so, but he is not a criminal and has never been involved in a criminal proceeding. His confinement is necessary for the protection of others but, to be constitutional, it must be therapeutic, not punitive. How egregious a placement in Matteawan would be is readily apparent from a consideration of the probable reaction of the appellant — whose mental health has not become stabilized but whose response to medication and sympathetic and concerned treatment has been favorable — upon confrontation with a correction officer trained to deal with a prison population. And if, despite this, the appellant did recover, he would be subject in the meantime to the hazard of “ emerging from his incarceration ”, as this court has observed in a not unrelated context, “ well tutored in the ways of crime.” (Matter of *166 Ellery C., 32 N Y 2d 588, 591.) No “ reasonable relation ” exists between so harsh a confinement and the purpose sought to be achieved.
Only confinement in a hospital under the jurisdiction of the Department of Mental Hygiene, then, is suitable; incarceration in a penal, security-oriented facility such as Matteawan would be wholly incompatible with, indeed destructive of, this purpose. A comparison of the differences in purpose and treatment between the two types of institution makes this abundantly clear.
By provisions of Constitution and statute (N. Y. Const., art. XVII, § 4; new Mental Hygiene Law, § 1.03 et seq.; cf., also, Covington v. Harris, 419 F. 2d 617, 625; Rouse v. Cameron, 373 F. 2d 451, 453; Morris, The Confusion of the Confinement Syndrome, 17 Buffalo L. Rev. 651, 679), the State is responsible for the “ care, treatment, rehabilitation, education, and training of the mentally ill ”. State hospitals, under the jurisdiction of the Department of Mental Hygiene, are required to furnish these services at a cost determined by ability to pay (new Mental Hygiene Law, § 7.05, subd. [a]; §§ 7.15, 9.03, 43.01), and the department is charged with seeing that “ personal and civil rights of persons receiving care and treatment are adequately protected ” (new Mental Hygiene Law, § 7.05, subd. [c]). Accordingly, great freedom is afforded civilly committed patients, wherever possible, in the matter of correspondence, visitors and access to the Mental Health Information Service; home visits, when feasible, are authorized and encouraged (new Mental Hygiene Law, §§ 15.01, 15.03, 15.05; 14 NYCRR Part 21).
Matteawan, in sharp contrast, is a correctional facility maintained by the Department of Correction for the primary purpose of “ holding in custody and caring for such mentally ill persons held under any other than a civil process as may be committed to the department by courts of criminal jurisdiction ” (Correction Law, § 400). Although originally conceived as “ something less than a prison but more than a hospital,” Matteawan has been “ allowed to falter” and to “ drift into decline as a pioneer mental hospital and into constantly improved status as a security institution ” (Mental Illness, Due Process and the Criminal Defendant — A Second Report *167 and Additional Recommendations by the Special Committee on the Study of Commitment Procedures and the Law Relating to Incompetents of the Association of the Bar of the City of New York [1968], p. 63). It has become increasingly devoted only to mentally ill convicted criminals (cf., e.g., CPL 730.50, subd. 1; CPL 730.60, subd. 1; Correction Law, § 409), who, however much they may be entitled to psychiatric assistance, are, nevertheless, serving out their prison terms. It has been characterized by more than one court and commentator in such terms as a “ maximum security institution “ no different from a jail ”, imposing restrictions not applicable to civil patients. “ There is no freedom of movement. Patients are always under strict supervision. They are confined to wards which are. locked; they have no access to the outside. They are not permitted to visit their homes. They cannot look forward to convalescent care.” (Katz, Goldstein and Dershowitz, Psychoanalysis, Psychiatry and Law [1967], pp. 696-697; see, also, Neely v. Hogan, 62 Mise 2d 1056,1060; Morris, Treatment of Mentally Ill “ NonCriminal Criminals ” in New York, 18 Buffalo L. Rev. 393, 418; cf. Jackson v. Indiana, 406 U. S. 717, 731, supra; Baxstrom v. Herold, 383 U. S. 107, 113-114.) Correspondence, visitors and access to the Mental Health Information Service are much more limited than for mentally ill civil patients (Correction Law, § 413).
Had section 85 — or its successor provision statute, section 29.13 — contained some less u restrictive alternative” than Matteawan for dangerously mentally ill civil patients, our conclusion might be different. (See, e.g., Covington v. Harris, 419 F. 2d 617, 623, supra; see, also, Roe v. Wade, 410 U. S. 113, 155; Aptheker v. Secretary of State, 378 U. S. 500, 512-513; Shelton v. Tucker, 364 U. S. 479, 488.) tc [T]he principle of the least restrictive alternative consistent with the legitimate purposes of a commitment,” Chief Judge Bazelok wrote in the Covington case, “ inheres in the very nature of civil commitment * * *. A statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly, construed in order to avoid deprivations of liberty without due process of law ” (419 F. 2d, at p. 623). There is, however, no possible way of construing section 85 to preserve its constitutionality since it provides no substitute for Matteawan. As *168 indicated, though, there are at least two State hospitals in the vicinity of New York City with closed wards for the care of the dangerously mentally ill as well as a third in the mid-Hudson area to which such patients may be sent. Implicit in the petitioner’s resistance to the appellant’s transfer to these institutions is the absence of funds to provide for civil placement of all civil patients. But the £ £ [c] ontinuing failure to provide suitable and adequate treatment cannot be justified by lack of staff or facilities.” (Rouse v. Cameron, 373 F. 2d 451, 457-458, supra; see, also, Inmates of Suffolk County Jail v. Eisenstadt, 360 F. Supp. 676, 687, supra; cf. Doe v. General Hosp. of District of Columbia, 434 F. 2d 427, 433; Matter of Ellery C., 32 N Y 2d 588, 591, supra.) Any such deficiency, then, cannot render the appellant’s transfer to Matteawan defensible.
The petitioner’s reliance on language in Baxstrom v. Herold (383 U. S. 107, 115, supra) and People v. Lally (19 N Y 2d 27, 35) to support his position is misplaced. The only point at issue in those cases was whether a mentally ill defendant who was ending a term of imprisonment (Baxstrom) or who had been acquitted on the ground of insanity (Lolly) was entitled to civil commitment and a jury trial of his need therefor. In each instance, the court decided those questions in the affirmative. The propriety of commitment of a dangerously mentally ill patient to a Department of Correction institution was, it is manifest, entirely peripheral to either court’s decision.
With regard to the appellant’s further contention that section 85 denies him equal protection of the law, it is enough to say that, although there are equal protection overtones in almost any due process argument, the appellant’s present claim to denial of equal protection is of insufficient substance to merit discussion.
The order of the Appellate Division should be reversed and that of the Supreme Court, New York County, reinstated, without costs.
Judges Burke, Breitel, Jasen, Gabrielli, Jokes and Wachtler concur.
Order reversed, etc.

. Effective January 1, 1973, the new Mental Hygiene Law (L. 1972, ch. 251) superseded the former statute. Section 29.13 of the new statute covers substantially the same subject matter as section 85 of the old.

. Unlike section 85, section 29.13 mandates a hearing — which, in any case, the appellant herein — represented by counsel — has had. Section 29.13 also provides that placement shall be in an “ appropriate institution in the state department of correction ” without mention of Matteawan by name, although that hospital is the only one answering to the term, “ appropriate institution ”.