John DOE, by His Mother and Next Friend, Mary ROE, and Christopher Hansen, on Behalf of Themselves and All Other Individuals Similarly Situated, Plaintiffs,

v.

Charles W. GAUGHAN, in His Capacity as Superintendent of Bridgewater State Hospital, Michael Fair, in His Capacity as Commissioner of Correction, Defendants.

Civ. A. No. 82–3811–C.

United States District Court,
D. Massachusetts.

Sept. 23, 1985.

Fine & Ambrogne, Roderick MacLeish, Jr., Boston, Mass., John L. Ciardi, Susan B. Tuchman, for plaintiffs.

Alexander G. Gray, Asst. Atty. Gen., Boston, Mass., for defendant Michael S. Dukakis.

John W. Bishop, Jr., Spec. Asst. Atty. Gen., Dept. of Correction, Boston, Mass., for defendants Fair & Gaughan and King.

## MEMORANDUM

CAFFREY, Chief Judge.

This is a civil matter which was tried to the Court sitting non-jury. The plaintiffs, John Doe and Christopher Hansen, respectively are a present and a former patient of Bridgewater State Hospital ("Bridgewater") in Bridgewater Massachusetts. The defendants are Charles W. Gaughan, superintendent of Bridgewater, and Michael Fair, the Massachusetts Commissioner of Correction. The plaintiffs contend that the circumstances of their involuntary confinement at Bridgewater is violative of their Fourteenth Amendment due process and equal protection rights, and is thereby actionable under 42 U.S.C. § 1983. The plaintiffs seek injunctive relief to bring the care and treatment of John Doe up to constitutional standards, and declaratory relief to the effect that Christopher Hansen had been unconstitutionally confined at Bridgewater.

The plaintiffs' case is comprised of two identifiable sets of claims. The first centers around the statutory framework and administrative structure of Bridgewater. In essence, the plaintiffs contend that their confinement in Bridgewater is unconstitutional because as civilly-committed mental patients they are confined with persons serving sentences for criminal convictions in an institution operated by the Commissioner of Correction. This circumstance, claim the plaintiffs, gives rise to two constitutional deprivations: (1) that the care and treatment available at Bridgewater is inferior to that provided in other Massachusetts mental institutions, thereby depriving the plaintiffs of equal protection of the laws and, (2) that the nature and duration of the plaintiff's commitment to Bridgewater does not bear a reasonable relation to the purpose for which they were committed, thereby depriving them of their due process liberty interests as articulated in *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).

The second set of claims has to do with the actual conditions of confinement at Bridgewater. The plaintiffs contend that due to overcrowding, understaffing, and the lack of properly trained staff Bridgewater fails to deliver "minimally adequate or reasonable" care and training as described in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). They further contend that this deficiency lengthens the duration of the resident's commitment and increases the amount of time that the residents are secluded or placed in restraints. All this, goes the argument, is in derogation of the plaintiff's liberty interest in freedom from confinement, freedom from unnecessary bodily restraint, and freedom from confinement in unsafe conditions.

After considering all of the testimony and evidence introduced at the trial, as well as the stipulations of fact and all other written submissions, I find and rule as follows:

### BRIDGEWATER

1. Bridgewater State Hospital is a part of the Massachusetts Correctional Institution at Bridgewater, and is administered by the Massachusetts Department of Correction ("DOC") pursuant to M.G.L. c. 125 § 18. Michael Fair is the Commissioner of Correction, and Charles Gaughan was the superintendent of Bridgewater at all material times.

2. Psychiatric and clinical services are provided to most Bridgewater residents by McLean Hospital Corporation (McLean) personnel working under contract with the DOC. The remaining residents are served by another contractor, Goldberg Medical Associates.

3. There are several state statutes pursuant to which persons may be admitted to Bridgewater for observation and evaluation or committed for a longer term. With one minor exception;[1] all such admissions or commitments are by state court order. No person may be committed to Bridgewater except upon a finding, beyond a reasonable doubt, that "(1) such person is mentally ill, (2) such person is not a proper subject for commitment to any facility of the department [of mental health]; and (3) the failure to retain such person in strict custody would create a likelihood of serious harm." M.G.L. c. 123 § 8(*b*)

4. The Bridgewater population consists of the following categories of persons:

(a) criminal defendants ordered to Bridgewater for evaluation to determine competency to stand trial or criminal responsibility. M.G.L. c. 123 § 15(*b*).

(b) persons found incompetent to stand trial or not guilty by reason of insanity where the committing court has made the findings required by § 8(*b*). M.G.L. c. 123 § 16.

(c) convicted criminals sent to Bridgewater for evaluation as an aid in sentencing where the committing court has made the findings required by § 8(*b*). M.G.L. c. 123 § 15(*e*).

(d) pretrial detainees or persons serving criminal sentences where the committing court has made the findings required by § 8(*b*). M.G.L. c. 123 § 18(*a*).

(e) persons transferred to Bridgewater from a department of mental health facility on an emergency basis and for a period of no more than 5 days where the superintendent of a Department of Mental Health ("DMH") facility determines that failure to retain him in strict custody would create a likelihood of serious harm.

5. As of August 14, 1984 the population of Bridgewater, broken down by place of origin, was as follows:

| Originating From | Number | Percent |
|---|---|---|
| DMH | 84 | 18.2% |
| Correctional Facility | 166 | 36.0% |
| Court | 211 | 45.8% |
| | 461 | 100.00% |

6. A statistical breakdown of the Bridgewater population by the statutory section is as follows:

| | As of 8/14/84 | | As of 11/14/84 | |
|---|---|---|---|---|
| Statutory Section | Number | Percent | Number | Percent |
| 15(b) | 70 | 15.1% | 75 | 15.4% |
| 16(a) | 7 | 1.5% | 12 | 2.5% |
| 15(e) | 40 | 8.6% | 39 | 8.0% |
| 18(a) | 48 | 10.3% | 54 | 11.1% |
| 13 | 7 | 1.5% | 7 | 1.4% |
| 17(a) | 3 | .6% | 4 | .8% |
| 16(b), (c) | 94 | 20.3% | 88 | 18.1% |
| 18 | 90 | 19.4% | 83 | 17.1% |
| 8 | 105 | 22.6% | 124 | 25.5% |
| | 464 | 100.0% | 486 | 99.9% |

7. As a result of the statutory scheme governing commitments to Bridgewater, the institution houses the most violent, troublesome mental patients in Massachusetts. Many of these patients are sent to Bridgewater because other mental health facilities, including prestigious private hospitals such as McLean Hospital, have found them to be unmanageable. Some 75–80% of Bridgewater inmates have major mental illness or psychotic disorders. Twenty percent of the residents have taken a human life.

8. Civil patients are more likely to be dangerous and unmanageable than those serving criminal sentences. Many civil patients have committed multiple violent criminal acts but have not been convicted of any crime. Of those patients at Bridgewater who have taken a human life, more than half are there on the basis of a civil commitment.

---

**1.** Pursuant to M.G.L. c. 123 § 13, men held in a facility operated by the Department of Mental Health may be transferred to Bridgewater for up to five days in an emergency situation.

9. Due to the nature of its population, Bridgewater has a "correctional ideology" in the sense that it provides strong external controls to patients. Many patients benefit from the "protective envelope" of correction officers because these patients often fear losing self-control with resultant harm to themselves or others. The presence of uniformed correction officers is therefore of therapeutic value to those patients. Moreover, this protective envelope provides a remarkably safe environment given the character of the patients. There have been no murders in Bridgewater in the last eight and a half years, and only five or six suicides. Given the number of men in Bridgewater who have taken life, this is an extraordinary record.

10. Despite this "correctional ideology" Bridgewater is not a prison. It differs from a correctional institution in that it is more concerned with mental illness and provides a more caring and nurturing environment. Staff concern for the resident's well being has produced an environment which is safer than a prison, generally weapon-free, and in which much more attention is directed to combatting illicit drug use than in a prison.

11. Bridgewater provides several educational and vocational programs for the benefit of the residents. The educational needs of the institution are met by an in-house school consisting of four teachers and a principal. Elementary through high school classes are taught, as well as GED, and special education programs for persons with learning disabilities. There are also night school, summer school, and college courses offered at Bridgewater through Massasoit Community College. Bridgewater maintains an 8,000 volume library which is available to residents. The institution also employs a full-time artist who works with patients. In addition, there is a carpentry program, an in-house maintenance program, and a seal program in which inmates collate materials for the March of Dimes.

12. Bridgewater also provides a number of recreational activities, including softball, basketball, volleyball, whiffleball, ping pong and bowling. Volunteers come in from outside the institution to participate in the softball and basketball programs. A gym is available to inmates on a regular basis. The Recreation Department of the institution is composed of three correction officers who work regular shifts and are designated as recreation officers. Volunteers from the community sponsor special events such as saturday night concerts, square dancing, movies, and beano. An organization called New Life Group conducts a religious program.

13. Other non-clinical special programs include Alcoholics Anonymous and Schizophrenics Anonymous.

14. Over 1,000 patients are admitted to Bridgewater annually. In recent years, the population of the institution has risen steadily from under three hundred and sixty men in February of 1981 to four hundred and ninety men in December of 1984. In April of 1985 the census peaked at five hundred and sixteen patients, but had been reduced to four hundred and seventy patients as of May 29, 1985.

15. Although some of the Bridgewater facilities were designed to accommodate a population of five to six hundred, other parts of the institution have become crowded with the present population of four hundred fifty to five hundred residents. This crowding has had a deleterious effect upon Bridgewater's ability to deliver certain services to residents. Specifically, the lack of space for nurses and other treatment team members to meet in has hampered implementation of the treatment team concept. Crowding has also reduced the personal space available to each resident, and tends to cause increased conflict and tension between residents with the result that some patients might withdraw and become sicker. The abuse of some patients by more aggressive patients, known as "strong-arming," is more likely to occur in these crowded conditions. Generally it has become more difficult for the institution to carry out clinical activities such as one-to-one therapy or group therapy.

16. The Bridgewater staff consists of clinical M.D.'s and Ph.D.'s, social workers,

nurses, correction officers and other administrative and support personnel. The patient care staff, including correction officers, are organized into treatment teams which meet weekly to review each patient's status.

17. Several professional positions, although authorized, have not yet been filled. Moreover, the number of correction officers actually on duty within the institution has actually declined since 1981, while the number of residents has risen. At present levels, Bridgewater is understaffed in several areas. This, coupled with the increase in population, has resulted in a decrease of staff time available to patients. Additionally, it has become more difficult for staff, particularly correction officers, to attend treatment team meetings because of the increased demands of the growing population. The morale of correction officers has suffered due to the combination of crowding and understaffing.

18. Nevertheless, the present staffing is adequate to provide minimally adequate care to Bridgewater patients. The primary professional disciplines providing services at Bridgewater are clinical psychiatry, psychology, and social work. Each discipline has a caseload of less than sixteen, which permits a professionally credible and defensible level of care to be delivered. Staff to patient ratio, is, however, not the sole determinant of the quality of care delivered in an institution.

19. The McLean staff which serves Bridgewater is highly competent and the evidence suggests that no other security institution in the country can match the quality of the Bridgewater staff.

20. The correction officers at Bridgewater are responsible for the day-to-day care and custody of the residents. All Bridgewater officers receive a course of training which includes a total of seven weeks of classroom work and three weeks of on-the-job training. The classroom training is identical to that which all correction officers undergo and has little to do with mental health issues. This training is, however, relevant to the correction officers' function in maintaining security and order among a dangerous and violent population. The three weeks of on-the-job training includes a familiarization period during which the officers are assigned to a psychologist and a social worker from the McLean staff who instruct the officers on the clinical aspects of their duties. In addition to this mandatory training, some eighty-four junior and senior correction officers attended a Psychiatric Orientation Program in the spring of 1983. Since that time, however, there has been no further in-service training for Bridgewater officers.

21. The correction officers at Bridgewater tend to remain on the job longer, and are paid more than, Mental Health Aides ("MHA") who perform comparable duties in Department of Mental Health facilities. Generally, the correction officers are assigned to a regular shift and location, which enables them to become familiar with the patients and their individual needs. In many cases, correction officers and patients develop long-term relationships which provide beneficial stability to the patients' lives.

22. Plaintiff John Doe, who has been diagnosed a chronic schizophrenic, presently resides at Bridgewater State Hospital. He is an extremely mentally ill individual. He frequently and unpredictably assaults others and often abuses himself. He has been known to bang his head against the wall and to attempt to gouge out his eyes. He is probably the most seriously mentally ill man in Massachusetts. I find that it is extremely unlikely that Mr. Doe will ever recover sufficiently to be able to live outside of a mental institution.

23. Doe was first institutionalized in 1970 at the Massachusetts Mental Health Center ("MMHC"). There followed a series of six more admissions to MMHC through 1978. During this period, Doe was admitted several times to a psychiatric program at Massachusetts General Hospital ("MGH"). Both MGH and MMHC are Harvard-affiliated teaching facilities and among the premiere training and research institutions in the country.

24. MMHC enjoys a higher staff to patient ratio than Bridgewater, yet MMHC found it necessary to transfer Doe to Bridgewater because of the security available there.

25. During the time he was an in-patient at MGH, John Doe received extensive attention, including extraordinary drug treatment and individual therapy. Nonetheless, his condition deteriorated steadily to an extremely primitive, regressive, disturbed plateau. It was in this condition that he arrived at Bridgewater on January 13, 1978.

26. John Doe is presently housed in Bridgewater's medical unit ("MU"). The MU tends the needs of patients requiring medical attention for problems such as broken limbs or insulin monitoring. The unit also houses patients who for one reason or another are unable to mix with the population of the institution in any other unit. These patients include: mentally retarded persons, persons in restraints, the very young and the very old.

27. Since he has been at Bridgewater John Doe has been frequently restrained by means of a gerry chair (a wheelchair with straps) or by the use of two and four point restraints. At other times he has been secluded in a room which is locked from the outside. Frequently when the door is not locked, Doe remains alone inside his room by his own choice.

28. Restraint and seclusion may be imposed at Bridgewater by correction officers only upon authorization of the professional staff, or in case of emergency. These controls are used in response to both assaultive behavior and some non-assaultive but environmentally disruptive behavior, such as uncontrollable screaming, public masturbation or human excrement smearing on walls and elsewhere. Correction officers may not institute seclusion or restraint on their own initiative, but may remove previously authorized restraints if it appears that restraints are no longer necessary. I find that as described, Bridgewater's use of restraint and seclusion is well within the parameters of professional judgment.

29. During Doe's later admissions to MMHC, he had been secluded a great deal of the time. At Bridgewater, he continued to be secluded. Beginning in the spring of 1982 Doe's seclusion decreased to approximately 50% of the time. This period of reduced seclusion corresponded with a period of individual therapy performed by Dr. Eugenio Chavez-Rice ("Dr. Rice"), who left the Bridgewater staff in the fall of that year. Subsequently, Mr. Doe spends about the amount of time in seclusion as before, which is approximately 75%. A portion of this time in seclusion is voluntary, as the door is unlocked.

30. The time that Mr. Doe spent in restraints increased from the time of his admission to 1980, and then decreased during Dr. Rice's therapy. Mr. Doe has been substantially free from restraints for the last six months before this trial.

31. Professional opinion varies as to whether this reduction in seclusion and restraint represents an actual period of improvement in Doe's condition. Doe's clinical history has been one of temporary ups and downs, making it difficult to determine whether any apparent improvement is a response to treatment or merely due to the natural course of the illness. Although Dr. Rice's physician's notes tend to support the improvement theory, records and reports kept by other staff members reveal that Doe was as assaultive and violent during this period as before. Accordingly, I rule that plaintiffs have failed to prove that Doe's condition improved in fact as a result of treatment by Dr. Rice.

32. In isolated incidents, Mr. Doe was the victim of abuse at the hands of the correction officers who were on duty in his unit. I find that on October 5, 1982 a correction officer entered Doe's room and taunted him with a plastic whiffle ball bat while he was in restraints on his bed. After an investigation of this incident by the DOC, the entire shift of correction officers who had been on duty at the time were transferred out of the unit. On other occasions, correction officers called Doe by his first name when they knew that such first

name use would enrage him. This conduct was, of course, non-therapeutic and not calculated to serve John Doe's best interests. I find that such conduct was, however, not characteristic of the officers in charge of Doe, nor was it condoned by the clinical or correction staff at Bridgewater, who took prompt investigatory and remedial action upon learning of the incidents.

33. Bridgewater correction officers maintain their own records on what are called "hard cards." These cards are passed from shift to shift and are intended to convey information about the status of the patients on the ward. Some of these cards reflect comments that describe John Doe's condition in nonclinical terms, i.e., he "went nuts" or is "nasty." Other cards reflect a weak attempt at humor: "[John Doe] cited many times for driving his wheelchair to endanger. . . ." Still other cards bear unreservedly objectionable comments such as: "[John Doe] is a good candidate for euthanasia." Unfortunate though these comments may be, particularly the last quoted, there is no evidence that they had an adverse impact on John Doe's care and treatment. Moreover, it appears that he never knew of the comments, so they could not have had any adverse emotional impact on him.

34. The MU, where plaintiff Doe is housed, is crowded when more than 30 patients are housed there. The average census for the unit is generally over that figure. This crowding has an impact on plaintiff in that it reduces the amount of time that Doe may spend out of his room. Additionally, the MU becomes quite busy weekday mornings because residents of other Bridgewater units come into MU for clinics and other services. This additional activity further reduces the time that Doe is likely to be able to tolerate being outside of his room. .

35. Although Doe's circumstances at Bridgewater have been less than ideal, the overall level of care and treatment afforded him has been adequate, and in some instances, extraordinary. I note that the several modalities of treatment employed include extensive drug therapy, family therapy, dietary analysis, endocrine analysis, hourly behavior analysis and one-to-one personal interaction with a ward worker, a psychology intern, and certain correction officers. With respect to drug treatment, nationally-known physicians were brought in on a consulting basis. It is unlikely that any other security institution in the country could call upon more prestigious, senior, recognized or knowledgeable physicians than those employed in treating John Doe.

36. The plaintiffs produced expert testimony to the effect that the drug program was not proper treatment for a patient in Doe's condition, and that other approaches should have been tried. Due to the considerable credible evidence to the contrary, I rule that the plaintiffs have merely established that there is professional disagreement with respect to the preferred mode of treatment for this singularly difficult patient. Nevertheless, I find that all standard modes of treatment have been attempted, as well as several extraordinary ones. In this respect, I find that Doe's care has exceeded what many professionals regard as a minimum standard of care.

37. The treatment plan drawn for Doe on June 15, 1984 is well within professional standards. Given Doe's deteriorating condition over the previous fourteen years and that many methods of treatment have proven unsuccessful, this plan realistically focuses on Doe's primitive levels of functioning.

38. Doe's medical record contains occasional suggestions that individual therapy might again be attempted. In light of the fact that prospects for successful therapy are generally better during the earlier stages of this illness, that individual therapy has failed in the past, and that John Doe is presently in an unresponsive and unpredictably assaultive state, I find that it is unlikely that such therapy would meet with success. Accordingly, I find Bridgewater's failure to implement a program of individual therapy in recent years is not a departure from generally accepted professional standards.

39. It is unlikely that any program, plan, or treatment beyond that which has already been provided by Bridgewater could or would reduce the amount of time which Mr. Doe spends in restraints or in seclusion. Again, plaintiff's evidence that other approaches are available merely reflects a divergence of professional opinion as to which is the preferred course. Moreover, I rule that the plaintiff has produced no credible evidence that such alternative modalities of treatment have a realistic likelihood of success in the sense that they would probably result in a meaningful improvement in the quality of John Doe's life.

CHRISTOPHER HANSEN

40. Plaintiff Christopher Hansen was admitted to Bridgewater in May, 1978 and August 1980, and was in the institution for a total of approximately three and one-half years. At the time of his second commitment he was diagnosed as having a manic depressive disorder. He was angry and belligerent and had assaulted several persons prior to his commitment.

41. During Hansen's commitment he was secluded several times for assault and for possession of contraband.

42. From November 1980 to May 1981 Hansen received one-to-one psychoanalytical treatment from a McLean social worker intern, from which he derived some benefit. He was also treated with lithium, which is recognized as a primary treatment for this disorder.

43. At present, Mr. Hansen is not an inmate in any institution and is working and married.

44. Insofar as Bridgewater played an important role in returning Hansen to society, I find that it delivered more than minimally adequate care. In making this finding, I note that plaintiff's evidence to the contrary rests upon speculation as to what might have occurred if Hansen were treated differently. The defendant's evidence, on the other hand, is supported by the fact that this formerly assaultive young man now is able to live an apparently normal, productive life. In weighing the conflicting expert testimony as to whether Bridgewater's treatment was professionally accepta-

ble, I find that this fact tips the balance in favor of the defendants.

RULINGS OF LAW

The plaintiff's first set of claims attacks the Massachusetts statutory scheme which permits civilly committed mental patients to be placed in an institution operated by the DOC together with persons who are serving sentences for criminal convictions.

It is true that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). Plaintiffs, citing the New York case of *Kesselbrenner v. Anonymous,* 33 N.Y.2d 161, 350 N.Y.S.2d 889, 305 N.E.2d 903 (1973), argue that the mix of civil and criminal patients in Bridgewater is a *per se* violation of this "rational relationship" requirement.

Without adopting *Kesselbrenner* as an accurate statement of governing constitutional law, I note that it is inapposite to the present case for several reasons. First, the plaintiff in *Kesselbrenner* was a civilly committed individual who was placed in Matteawan State Hospital, which is described as a "correctional facility primarily for mentally ill convicted criminals." 350 N.Y.S.2d at 890, 305 N.E.2d 903. The court in *Kesselbrenner* found that Matteawan had been "allowed to falter" and to "drift into decline as a pioneer mental hospital and into constantly improved status as a security institution." *Id.* at 893, 305 N.E.2d 903. The patients at Matteawan are subject to penal restrictions upon basic liberties such as correspondence, visitors and access to the outside which are not related to their status as mental patients. *Id.* Obviously, a civil patient thrust into this overwhelmingly penal atmosphere would suffer deprivations of liberty in excess of that which the purpose of his commitment would require.

In contrast, Bridgewater serves a broader spectrum of patients, all of whom, convicted or civil, meet the same criteria. With the exception of § 13 emergency

transfers from DMH facilities, no person may be committed to Bridgewater unless: "(1) such person is mentally ill; (2) such person is not a proper subject for commitment to any facility of the department [of mental health]; and (3) the failure to retain such person in strict custody would create a likelihood of serious harm." M.G.L. c. 123 § 8(b). Thus, the Bridgewater population is defined in terms of the patient's need for institutionalization and society's need to isolate dangerous individuals. *See Santana v. Collazo*, 714 F.2d 1172, 1176 (1st Cir.1983), *cert. denied* — U.S. —, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984) (society may legitimately confine individuals solely to protect itself from them).

To the extent that Bridgewater has adopted a "correctional ideology" I find it is necessitated by the dangerous character of the patients. There is no evidence before the court that the plaintiffs have suffered any loss of freedom because they were confined with convicted criminals. Rather, there is evidence which would allow the court to find that the security measures extant at Bridgewater are even more appropriate to civil patients, who are more likely to be aggressive, violent, and unmanageable. Plaintiffs Doe and, to a lesser extent, Hansen were both such violent, assaultive individuals for whom the strict security of Bridgewater was appropriate.

Bridgewater also differs from Matteawan in that it offers a host of educational, recreational, rehabilitative and vocational programs to its patients. This is additional evidence that the institution does not deprive its patients of liberty although some are serving criminal sentences. I note in this context that although only approximately 25.5 percent of Bridgewater's patients are "civilly committed" by plaintiff's definition, another 23% of the patients are not serving criminal sentences, nor are they at Bridgewater for forensic evaluation pending criminal prosecution. Only 36% of the Bridgewater population has been transferred to the institution from correctional institutions. With these figures in mind, it is clear that Bridgewater is not an institution that targets its programs and services for a penal population.

The statutory scheme pursuant to which civil patients are committed to Bridgewater may be distinguished in another aspect from the New York statute challenged in Matteawan. Section 8(b)(2) of Chapter 123 of the Massachusetts General Laws provides that no person may be sent to Bridgewater unless he is found not a proper subject for commitment to a facility operated by the Department of Mental Health. The New York statute in *Kesselbrenner* contained no such provision, leaving open the possibility that civil patients might be transferred into the highly restrictive Matteawan environment when less restrictive institutions were available. In Massachusetts, only those patients who require the strict security of Bridgewater may be sent there. This is in keeping with the constitutional requirement that state curtailments of individual liberties be accomplished through the least restrictive means available to accomplish a legitimate state purpose. *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

The plaintiffs also look to the recent federal case of *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir.1984), for support. Even a summary examination of the facts in *Lynch* is sufficient to distinguish it from the present case. In *Lynch*, the state of Alabama used jails to hold persons awaiting involuntary commitment proceedings. Conditions in these jails were "desperate," worse even than Alabama prisons, let alone mental institutions. *Id.* at 1460. Because such persons were held in worse conditions than they would have been subject to if committed, the scheme was an obvious violation of the *Jackson* "rational relation" standard and the *Shelton* "least restrictive means" requirement. Without restating the facts, it is clear that this is not the situation at Bridgewater.

I rule, therefore, that the state action in confining civilly committed mental patients in Bridgewater together with mental patients serving criminal sentences is

not a *per se* violation of the plaintiff's constitutional rights.

The plaintiffs' second set of claims concern the conditions at Bridgewater, claiming that these conditions violate the plaintiff's Fourteenth Amendment rights as set forth in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Specifically, the plaintiffs seek to prove that Bridgewater has failed to confine them in safe conditions, and has failed to exercise professional judgment with respect to their care, treatment, and restraint.

As to the safety component of the plaintiffs' claim, it is sufficient to say that this Court has heard no credible evidence to warrant a finding that Bridgewater is unsafe. In fact, given the nature of the population, I find that Bridgewater is a more safe institution than one would expect.

▉ With regard to the remaining grounds, the Supreme Court has never identified a *per se* constitutional right to treatment. A mentally ill person is entitled to only so much treatment as is minimally adequate or reasonable to ensure safety and freedom from undue restraint. *Id.* at 319, 102 S.Ct. at 2459. Such treatment is not an end in itself, but is rather a means of enhancing the liberty interest of a confined individual. *Id.* A mentally ill or mentally retarded person does not, however, have an unbridled right to liberty. The state may curtail such liberties only where necessary to protect others or the patient himself. *Id.* at 320, 102 S.Ct. at 2460. "The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint ... is such as to violate due process." *Id.* The line of demarkation between acts which violate due process and those which do not is whether the action taken was "reasonable," i.e. whether the decision was based upon the exercise of professional judgment. *Id.* at 323, 102 S.Ct. at 2462.

▉ Courts are to adopt a deferential standard in reviewing restraint and treatment decisions which:

"... if made by a professional, [are] presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person actually did not base the decision on such a judgment."

*Id.* at 323, 102 S.Ct. at 2462.

A professional decisionmaker is "a person competent, whether by education, training or experience, to make the particular decision at issue." *Id.* at 323 n. 30, 102 S.Ct. at 2462 n. 30. In the context of Bridgewater, this means that long-term treatment decisions should be made by psychiatrists and psychologists, but that short-term or emergency decisions may be made by correction officers.

▉ Plaintiffs challenge Bridgewater's use of restraints and seclusion on the grounds that they have been applied upon the initiative of correction officers; that they have been applied for non-therapeutic reasons, including the convenience of the staff; and that they have been used excessively. There is evidence in the record that restraints and seclusion were, at one time, applied at the discretion and initiative of correction officers. This might well constitute a substantial departure from professional standards. That time has passed and I find that present Bridgewater practice is to use restraint and seclusion only after approval by a member of the professional staff, and that correction officers may reduce the degree of restraint when no longer necessary. Because the plaintiffs seek prospective relief only, and there is no threat of return to the prior practice, I look only to the present practice for the purposes of this memorandum. I find and rule that the present procedures for the use of restraint and seclusion are based on the exercise of professional judgment, as contemplated in *Romeo*, and thereby adequately protect the constitutional rights of the plaintiffs.

With respect to the seclusion and restraint imposed upon John Doe and Christopher Hansen, there is no credible evidence

on the record that such seclusions or restraints as used were excessive or improper under the particular circumstances of each case. Both patients, particularly Mr. Doe, were dangerously assaultive. To the extent that restraints or seclusion were imposed to protect staff, other patients, or the plaintiffs themselves from a real threat of violence it is unquestionably within the power and responsibility of the Bridgewater staff to take such action. With respect to the vast majority of the restraints and seclusions on the record, I find that this was the case.

At other times, sanctions were initiated in response to patient behavior which was not assaultive, such as shouting, feces smearing, or other disruptive behavior. I find that the use of restraints and seclusion in response to this behavior is within the scope of professional judgment and was properly imposed to preserve the environment of the institution and for training purposes with respect to the individual restrained. Such therapeutic restraint or seclusion is constitutionally permissible where "necessary to ... provide needed training." *Id.* at 324, 102 S.Ct. at 2462.

■ There is, therefore, no basis in the record for a finding that restraint or seclusion was excessive or arbitrarily imposed. It is well-documented that John Doe was and remains an extremely assaultive, dangerous individual who may require restraint and/or seclusion from time to time. The mere fact that he was restrained or secluded a great deal of the time, even more than is usual for a state hospital patient, fails to prove that any one restraint was constitutionally impermissible. By the same token, the same facts fail to prove that he was restrained arbitrarily for the convenience of the staff, not withstanding conclusory testimony to this effect by one of plaintiffs' expert witnesses. In that such testimony is based purely upon a review of medical records, and was soundly rebutted by the testimony of correction officers and professional staff from Bridgewater, I conclude that it lacks convincing force. Again, I find and rule that restraint and seclusion were imposed upon the plaintiffs pursuant to the exercise of professional judgment and for constitutionally permissible reasons.

■ Finally, the plaintiffs complain that Bridgewater failed to provide adequate care, treatment and training to reduce plaintiffs need for restraint and seclusion, thereby impairing their constitutionally protected liberty interests. In that the standard for determining the adequacy of treatment and training is also whether professional judgment was exercised, many of the foregoing considerations apply. Additionally, I find and rule that Bridgewater's treatment of John Doe has been adequate and even extraordinary. All standard modalities of treatment have been attempted. Consultations were obtained with nationally-renowned psychiatric experts, and new, creative methods of treatment were designed and executed. In this context, the plaintiff has succeeded only in proving that professional opinion differs as to which modalities are appropriate and which are not. This does not establish a constitutional deprivation.

■ Moreover, the defendants are under no obligation to institute treatment or training which is unlikely to improve a patient's ability to function free from seclusion and restraint. *Romeo* at 324, 102 S.Ct. at 2462. As to John Doe, the evidence is overwhelming that he would not benefit from the treatment modalities proposed by the plaintiffs to the extent that his liberty interests would be significantly enhanced. As to Christopher Hansen, the evidence is that he successfully participated in an educational program, benefited from his Bridgewater treatment, and is now free from any institutional restraint. Thus, neither plaintiff has been deprived of any constitutionally protected interest.

■ In so ruling, I am cognizant of the fact that Bridgewater is both crowded and understaffed in some areas. This makes for less than ideal conditions which may impact negatively on some patients. In the case of John Doe, for example, the increased activity within the MU causes him to spend more time in his room. This,

however, is a result of his most unfortunate and devastating mental illness as much as it is a shortcoming of the facility. The constitution does not require a state to provide an ideal environment for each person in its mental institution. Rather, it must provide an environment in which professional judgment may be exercised. Because Bridgewater's facilities are not so lacking as to prevent this exercise of professional judgment, these shortcomings do not rise to the level of a constitutional deprivation.

Order accordingly.