OPINION OF THE COURT
James A. Yates, J.
*67 Daisy Betances is charged in two indictments with selling, on each occasion, three vials of crack/cocaine to an undercover officer. In November of 1996, Ms. Betances was found unfit to proceed, pursuant to CPL article 730, and committed to the custody of the Commissioner of the Office of Mental Health (Commissioner) for one year for “care and treatment in an appropriate institution”. (CPL 730.50 [1].) She was placed by the agency in the Mid-Hudson Psychiatric Center, a secure facility. Prior to the expiration of the order, the superintendent of Mid-Hudson applied to retain her in the facility. Ms. Betances requested a hearing on the retention application and asked that she be found fit to proceed, or, in the alternative, that she be transferred to a less secure facility. She also requested that pursuant to Jackson v Indiana (406 US 715 [1972]), if this court determined that she is unfit again, she be released or that the State apply to convert her commitment to a civil one.
A hearing was held at which Ms. Betances’ treating psychiatrist at Mid-Hudson Psychiatric Center, Dr. Dominick Ferro, testified, as did Ms. Betances. Also admitted were her medical records. After the hearing, review of the medical records, submissions and arguments by both sides, I find that Ms. Betances remains unfit to proceed. As the court needs more information to determine whether a secure facility is the appropriate facility for her care and treatment, I am committing her to the Commissioner for a period of 60 days, and direct the Commissioner to submit updated reports to the court at the end of that period.
Dr. Ferro testified as both a fact and an expert witness. He saw Ms. Betances on a regular basis over the period of her commitment; he met with her once a week and saw her daily. He testified that in his opinion, Ms. Betances was unfit to proceed with her criminal cases and diagnosed her as having schizophrenia. He testified that she had auditory hallucinations and held unrealistic beliefs, i.e., that she had been turned into a monkey and that snakes lived in her belly.
In Dr. Ferro’s opinion, Ms. Betances has only a partial understanding of the charges against her. She stated to him that she was charged with a stem and a lighter, and was unclear about the roles of the parties to the court proceedings. He testified that there was a period of time, in the summer of 1997, when Ms. Betances displayed an improved ability to communicate and seemed to have a better understanding of the criminal process. In his opinion, at that point, she was close to fitness. Dr. Ferro testified that the variation in her condition *68 was typical of schizophrenics, who often have recurring symptoms.
Prior to her return to court, Ms. Betances expressed apprehension about her court appearance and told Dr. Ferro that she feared for her safety at Mid-Hudson. Dr. Ferro testified that on November 24, 1997, the day before she was scheduled to leave the facility for her return to court, she became agitated and threatened to assault other patients or staff. He stated that this was the most serious incident (although there had been one or two more minor incidents in the preceding week). She was placed in wrist to waist restraints and soon after, when she fought with another patient, she was placed in seclusion. The medical records show that, although she was initially placed in seclusion by the hospital, Ms. Betances requested to stay there until she was released to be brought to court.
Dr. Ferro also testified that in 1993, prior to her involvement in these cases, she left a psychiatric facility without authorization. Her medical records showed that Ms. Betances has received psychiatric care at nonsecure facilities in the past, both voluntarily and involuntarily. Dr. Ferro testified that in his opinion Ms. Betances was dangerous because of her assaultive behavior and that her behavior was a product of her mental illness.
Ms. Betances testified on her own behalf. She is a small, thin, 39-year-old woman of frail appearance. Although she has twice been arrested, both incidents involved small amounts of drugs. She has no history of arrest for assaultive, violent or dangerous conduct. Her behavior in court, both on and off the stand, supports this court’s conclusion that she is unfit to proceed. At times she can recall and describe events in a direct fashion. However, as she becomes apprehensive or agitated, she rambles and wanders into states of confusion and seeming nonsense. During the hearing, she stated that she had been assaulted at Mid-Hudson and that, as was confirmed by the medical records, she requested to stay in seclusion for her safety. She testified that, on a different occasion, another patient attacked her and hit her in the neck, which was also confirmed by the medical records..
defendant’s fitness to proceed
Based on Dr. Ferro’s testimony, the medical records, Ms. Betances’ testimony and this court’s evaluation of Ms. Betances, I find that she remains unfit to proceed with her crimi *69 nal cases. This conclusion is based on her lack of understanding of the nature and seriousness of the criminal charges against her and the lack of her ability to assist her criminal counsel in preparing and conducting the case.
CARE AND TREATMENT IN APPROPRIATE FACILITY
Pursuant to an order of the court, Ms. Betances was committed to the Commissioner for “care and treatment in an appropriate institution.” She contends that this order is being violated in that she is not in an appropriate facility for her care and treatment. A commitment pursuant to CPL article 730 is based only on the determination that the defendant is unfit to proceed with a criminal case. Therapeutic treatment is then ordered by the court in an attempt to restore the defendant to fitness. That therapeutic treatment may be received in many different settings as the Commissioner “may transfer [the defendant] to any appropriate institution”. (CPL 730.60 [3].)
At the hearing, the court was informed by the Assistant Attorney-General that all persons committed to the Commissioner pursuant to article 730 who are charged with felonies are held at a secure facility. This restrictive policy apparently flows from a fear of danger to the community or elopement by article 730 patients. However, not every incompetent defendant facing felony charges is dangerous or likely to run away. It could very well be that a person, such as Daisy Betances, might, if discretion were properly exercised by the Commissioner, be found to present no risk of danger or escape. In fact, if Ms. Betances is to be believed, she herself is the victim of abuse by more violent inmates at the secure facility — a circumstance which puts in question the suitability of her placement.
The Commissioner argues in this case, through Dr. Ferro and the Assistant Attorney-General representing him, that all persons charged with a felony should he kept in secure facilities. However, this “policy’ of confinement runs counter to the Commissioner’s own regulations which recognize that “[a] history of treatment for mental illness has not been demonstrated to be related to violent behavior” although “one relatively reliable indicator of future violent criminal behavior is past acts of criminal violence.” (14 NYCRR 540.1.) For that reason, the regulations themselves contemplate not only transfers to unsecure facilities, but furloughs, for nondangerous persons committed under article 730. (14 NYCRR 540.4-540.6.)
*70 Article 730 was not designed to function as a pretrial detention alternative to CPL article 510 (“Recognizance, Bail and Commitment”). If it were, the statute would merely require commitment to the Commissioner’s custody for purposes of confinement. To the contrary, the statute specifically mandates commitment for “care and treatment”. Nor does the statute require secure confinement. Instead, it requires the Commissioner to exercise discretion in determining which institution is appropriate, in a given case, for care and treatment of an incompetent defendant. (See also, 14 NYCRR 540.6, 540.9 [j] [governing transfer of article 730 committees from a secure facility to an unsecure one].)
In the case before the court, Ms. Betances does not have a demonstrated history of prior arrests for criminal violence. At issue are several threats or engagements in the institution where Ms. Betances claims she was responding to abuse. Sadly, were Ms. Betances fit to proceed, it is unlikely that she would still be in jail — having been detained for more than IV2 years for two low-level drug offenses. Certainly, in enacting article 730 the Legislature did not intend to single out nondangerous but mentally ill defendants for greater confinement than their competent counterparts.
If the defendant is not receiving care in an institution that is appropriate for her treatment, then an order of the court, issued pursuant to statute, is not being followed. This court has the power to oversee and enforce its orders. (See, People v Schaffer, 86 NY2d 460, 469 [1995] [trial court has “continuing jurisdiction * * * to monitor the defendant’s condition and location” when a defendant is committed pursuant to article 730]; Judiciary Law § 2-b [3] [a court of record may “devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it”].)
The defendant contends that an appropriate institution for her treatment is an unsecure facility. The Director of Mid-Hudson maintains that Ms. Betances will receive more appropriate care in his facility, which is a secure facility. The determination of which facility is appropriate for the treatment of Ms. Betances is an important one, impacting on many interests. At this time the court needs updated information to make that determination. Ms. Betances appears to have somewhat cyclical symptoms, and this court needs more recent information before determining whether the Commissioner is in compliance with court orders and the. statute.
An appropriate facility is one that provides “care and treatment” for the committee and does so in the least restrictive *71 manner. (See, Matter of Kesselbrenner v Anonymous, 33 NY2d 161 [1973]; People ex rel. Jesse F. v Bennett, 242 AD2d 342 [2d Dept 1997] [statutory procedures were enacted to insure “the right of a patient who has been indicted, but not yet convicted, not to be confined in a setting which is more restrictive than necessary to achieve the purpose for which the individual is confined”]; McGraw v Wack, 220 AD2d 291, 292 [1st Dept 1995] [“deprivation of personal liberty greater than necessary to achieve the purpose for which that individual is confined is violative of due process”].)
In the case of insanity acquittees the Legislature has outlined procedures for insuring that people committed pursuant to CPL article 330 are not held in a secure facility when they can be safely treated in a less restrictive environment. (See, CPL 330.20.) As part of those protections, an insanity acquittee is entitled to the same rights and the same review process outlined for a patient civilly committed under the Mental Hygiene Law. (See, CPL 330.20 [16], [17].) There is no logical reason to believe that, in prescribing “care and treatment” at “an appropriate institution”, the Legislature intended harsher treatment for a patient who is merely accused of a nonviolent criminal act, but not proven to have committed any crime at all, than one found not responsible by reason of mental disease or defect. As such, it is clear that Ms. Betances has a right, by statute, regulation and the Constitution to a fair consideration of what constitutes “an appropriate institution” for her “care and treatment”. She will be committed, for a period not to exceed 60 days for the Commissioner to evaluate her placement in accordance with those principles. At the end of that 60 days, the court will hear the parties on what constitutes appropriate care and treatment for Ms. Betances.*
defendant’s APPLICATION FOR RELIEF PURSUANT TO JACKSON v INDIANA
The defendant also contends that because she is still not fit she is entitled to relief under Jackson v Indiana (406 US 715 [1972], supra). Jackson mandates that a defendant committed *72 as unfit to proceed may only be held for a reasonable period of time to determine whether fitness will be restored in the foreseeable future. Based on the evidence before this court, I find that Jackson relief is not appropriate at this time.

 Article 730 does not further define “care and treatment” and does not specify what constitutes “an appropriate institution”. However, the Commissioner and the court can be guided by analogy in the way that the Legislature has mandated care and custody of closely related, if not similarly situated, patients — specifically insanity acquittees under CPL article 330 (see, CPL 330.20), and involuntarily committed persons under the Mental Hygiene Law (see, Mental Hygiene Law § 9.27).